**Grace M. ALMONTE, et al., Plaintiffs, Appellants,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY, Defendant, Appellee.**

No. 85–1187.

United States Court of Appeals, First Circuit.

Argued Jan. 8, 1986.

Decided April 2, 1986.

Rehearing Denied May 5, 1986.

Edward L. Gerstein with whom Sharon O'Keefe, Providence, R.I., was on brief, for plaintiffs, appellants.

Raymond A. LaFazia with whom Netti C. Vogel and Gunning, LaFazia & Gnys, Inc., Providence, R.I., were on brief, for defendant, appellee.

Before COFFIN, Circuit Judge, RO-SENN,* Senior Circuit Judge, and BOWNES, Circuit Judge.

* Of the Third Circuit, sitting by designation.

1. This is the second time this case comes before us. The first time plaintiff Almonte was joined by two other plaintiffs, Fairway Foods and Consolidated Ice Cream. We set aside a verdict for

BOWNES, Circuit Judge.

Plaintiff, Grace Almonte, appeals from a district court order entering judgment for defendant, National Union Fire Insurance Company, in an action brought by plaintiff to recover for losses caused by fire and vandalism at an ice cream manufacturing plant in Providence, Rhode Island.[1] Plaintiff contends that the district court erred in: (a) failing to give the jury a clear instruction on the legal definition of ownership; (b) admitting inadmissible hearsay statements as the basis of an expert opinion; and (c) denying plaintiff's motion for a new trial. The circumstances underlying plaintiff's suit are as follows.

The ice cream plant involved in this case was originally owned by plaintiff's father-in-law, Angelo Almonte (Angelo), as part of a family-run ice cream business, Federal Ice Cream. Angelo retired from the business in 1972 and transferred all his stock in Federal Ice Cream to his son Anthony Almonte (Anthony), plaintiff's husband. Angelo retained ownership of the plant, however, in the name of Santino Realty, a real estate company owned by him. He also held a chattel mortgage on Federal Ice Cream's equipment.

Once in control of the business, Anthony started to expand Federal Ice Cream. He bought plants and distributing companies in Massachusetts and Connecticut and plaintiff helped him by contributing to these purchases out of her personal funds. Unfortunately, Anthony's plans soon went awry. Federal Ice Cream ran into severe financial difficulties. In 1974, it was petitioned into receivership and it remained in that status for about a year and a half, when Angelo came to the rescue and bought it out.

The Providence plant remained open throughout the period of the receivership. Though Federal Ice Cream did not manufacture ice cream during that time, it con-

the plaintiffs in that case and remanded for a new trial, *Almonte, et al. v. National Union Fire Insurance Company,* 705 F.2d 566 (1st Cir.1983). The corporate plaintiffs have since disappeared from the case.

tinued to sell ice cream from stock purchased from other manufacturers. For three years following the receivership the Providence plant was operated as Genico, Inc., by Gino Faiola, a former employee of Federal Ice Cream. Faiola did not manufacture ice cream either but merely sold ice cream to Federal Ice Cream customers.

In early 1977, Anthony and Gino Faiola decided to get back into the ice cream manufacturing business with a new corporation, Fairway Foods. They agreed to close down the Providence plant so that it could be refurbished and they concluded a tentative agreement with Ernest Antollino, principal of an ice cream distributorship, Consolidated Ice Cream, for the distribution of Fairway Foods' product. It was also agreed that the ice cream would be marketed under the Federal Ice Cream label. Anthony proceeded to make major improvements to the plant. He had all the machinery repaired and additional equipment shipped in from Federal Ice Cream's then defunct Massachusetts plant. He also had much of the plant repainted. Plaintiff again contributed to his plans, providing $50,000 towards the cost of these improvements, which was raised by taking out a mortgage on a residential property she had inherited from an aunt.

When most of the improvements were complete, Anthony and plaintiff contacted Don Caldwell, an insurance broker who had serviced the needs of Federal Ice Cream for several years, about insuring the plant. Though neither Anthony nor plaintiff had legal title to the plant at the time, plaintiff testified that she wanted the plant insured because she knew that Angelo, the owner of the plant, intended to transfer it to her. With Anthony's help, plaintiff chose a low budget one year premium insurance policy which covered the plant's manufacturing building and contents against fire and vandalism for $550,000 and the attached office building and contents for $70,000. Anthony arranged financing to pay the $9,965 premium. The policy was issued on July 1, 1977, and plaintiff, Fairway Foods and Consolidated Ice Cream were named as insureds.

Later that year, in October 1977, Angelo did in fact transfer title to the plant and its equipment to plaintiff. Angelo had considerable personal wealth and this transfer was made in the course of a general disposition amongst his seven children of certain assets, totalling approximately $1,000,000 in value. Angelo testified that he had wanted to give the plant to Anthony free of charge but that Anthony had persuaded him to put it in plaintiff's name instead as security for the money plaintiff contributed to Anthony's business. According to Angelo, Anthony also suggested that Angelo put fixed prices on the various items of personal property. Anthony's brother, an attorney in Rhode Island, was enlisted to draw up formal bills of sale. Plaintiff gave Angelo two promissory notes for the property and Angelo retained a $28,000 chattel mortgage on the equipment and a $47,000 mortgage on the plant buildings. The deed transferring the plant to plaintiff was recorded on October 12, 1977. Plaintiff then allegedly entered into agreements with Anthony and Faiola, as owners of Fairway Foods, and Ernest Antollino, owner of Consolidated Ice Cream, for the lease of the plant.

The events triggering the instant suit began on October 25, 1977, just a few days after the property had been transferred to plaintiff. Anthony reported to the police that the plant had been vandalized. On investigation the police found that extensive damage had been done, particularly to the machinery, and that the plant had been rendered completely inoperative. When Anthony reported the incident to the insurance broker, Caldwell told him that the bulk of the loss was not covered because the policy did not cover vandalism to the contents of the plant as distinct from vandalism to the buildings. Five days later, there was a fire at the plant totally destroying the buildings and most of the equipment.

Police and fire officers who went to the scene of the fire concluded that it had been deliberately set and the matter was turned

over to the Police Department for further investigation. Plaintiff hired a public adjuster to appraise the damage and defendant also sent several agents out to the razed plant to make an appraisal. When plaintiff submitted her proofs of loss for both the vandalism and the fire, defendant refused to pay on either claim. Plaintiff then filed suit.

Defendant relied on two clauses in the insurance policy: one providing that the policy would be void if the insured "wilfully concealed or misrepresented any material fact or circumstance" concerning the insurance or the interest of the insured therein or in case of any fraud by the insured relating thereto; and the other providing that defendant would not be liable for loss occurring as a result of a hazard increased by any means within the knowledge and control of the insured. Defendant contended that plaintiff was not the owner of the insured property, that the plant actually belonged to Anthony, and that the policy was, therefore, void. Defendant claimed further that Anthony was responsible for the losses and that the losses were fraudulent and within the 'increased hazard' bar of the policy. In support of its position, defendant urged that plaintiff's name on the title deed and other documents was not conclusive and that the entire set of circumstances surrounding the transfer of the plant had to be taken into account in deciding who owned the plant.

The defendant elicited evidence at trial to add force to its claim that Anthony owned the plant. In addition to showing that the promissory notes were Anthony's idea, defendant also established that Angelo had not received, and did not expect to receive, any payment from plaintiff on those notes. This reinforced defendant's contention that the transaction was a sham. Defendant also relied on the fact that Anthony applied for the insurance with plaintiff and arranged the financing for it and on the degree of control he exercised over the plant as evidence of Anthony's proprietary interest. Plaintiff's own testimony strengthened defendant's case for she displayed little or no knowledge of the nature

and extent of the equipment in the plant that she alleged she had leased to Anthony. Nor could she verify whether she had signed the lease agreements as alleged and the agreements themselves could not be found.

Defendant relied primarily on circumstantial evidence to link Anthony to the acts of vandalism and the fire. It showed that Grace and Anthony were in severe financial straits prior to October 1977 and that their joint tax return for the preceding three years indicated an income of less than $3,000 per annum. Defendant suggested that the decision to take out a policy costing over nine thousand dollars in premiums was cause for suspicion in light of this impecunity, particularly when the plant had not been insured for the preceding three and one-half years. That same impecunity, defendant contended, supplied ample motive for fraud.

Defendant also urged that a connection between Anthony and the vandalism could be inferred from the testimony of one of the investigating police officers, Urbano Prignano, that he thought the vandalism had been done over a period of time by someone who knew what he or she was doing. Robert Tompkins, one of plaintiff's appraisers, also testified that the vandalism was unusually destructive. All valves, gauges, switches, et cetera, had been forcibly smashed, the shafts to some of the air compressors had been cut with an acetylene torch and a caustic solution had been thrown into the motors. Finally, there was testimony that at the time of the incident Anthony did not know that the contents of the plant were not covered by the policy.

Both the investigating police officer, Leonard Wood (Wood), and the Providence fire inspector, Allen Marshall (Marshall), testified that the fire at the plant was started by igniting paper stock in three or four locations throughout the plant buildings. Defendant showed that Anthony spent the five days between the vandalism and the fire moving paper stock into the plant with the help of one of the plant

employees, Guido De Marco. Any adverse inference resulting from these activities, however, was at least partly rebutted by De Marco's testimony that the stock was moved to make room in the warehouse for the vandalized equipment being brought there for repair. As for Anthony's activities the night of the fire, the evidence showed that Anthony was the last person at the plant that evening, that he returned later on, allegedly to pick up a car in the yard outside the plant, and that he returned home between 10:30 and 11:00 p.m. after making a brief stop at a local bar. The fire was determined to have been started about 10:10 p.m.

Defendant relied on these facts to show that Anthony had an opportunity to start the fire. It contended that the inference that he actually did so could be drawn from three additional facts: (a) that firemen arriving at the scene found that no forced entry had been made, indicating that the fire was started by someone who had a key to the plant; (b) that Officer Prignano testified that when Anthony learned the vandalism loss was not covered, he blurted out, "I should have had a fire"; and (c) that Officer Wood testified to commenting on an empty gasoline can to Inspector Marshall within Anthony's earshot, and to finding the can removed and Anthony missing moments later on returning to the room in which the can had been. Though the fire was not thought to have been started with an accelerant, the can did have some significance because firemen at the scene had noted an odor of gasoline.

Plaintiff attempted to rebut these inferences by suggesting that the firemen's finding of no forced entry was unpersuasive because they had not adequately considered the possibility that an intruder could have entered through a skylight. Plaintiff also denied that Anthony made the remark alleged by Officer Prignano and maintained that Anthony did not know the vandalism losses were not covered at the time of Prignano's investigation.

## I. THE ADEQUACY OF THE TRIAL JUDGE'S INSTRUCTIONS ON OWNERSHIP

As this court held in *Monomoy Fisheries, Inc. v. Bruno & Stillman Yacht Co., Inc.*, 625 F.2d 1034, 1037 (1st Cir.1980), when no objection has been made to a jury charge reversal will only be warranted where the instructions given amount to plain error. Further, in *Connors v. McNulty*, 697 F.2d 18, 20 (1st Cir.1983), we held that a judgment will not be reversed for error in the jury instructions unless the error is determined to have been prejudicial after review of the record as a whole. Accordingly, we must look to the entire jury charge to determine whether the jury was properly apprised of the legal principles to be applied in this case. *See Smiddy v. Varney*, 665 F.2d 261, 265 (9th Cir.1981), *cert. denied*, 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).

The district court instructed the jury that plaintiff had to prove four elements in order to recover: (1) ownership or some other insurable interest in the property; (2) the existence of an insurance contract; (3) the occurrence of a loss covered by the policy; and (4) the amount of the loss. It then explained that defendant relied on a provision in the policy exempting it from liability if the insured had wilfully concealed or misrepresented any material fact, and that its first affirmative defense was arson, *i.e.*, that the losses were fraudulent because the fire was deliberately set. The court described the application of this defense in some detail:

> However, the fact that the property may have been intentionally burned by another does not defeat liability where an insured is not implicated in the act.... If you find that defendant has proved that ... Anthony Almonte is implicated in the fire or vandalism, that's only one step. Then you must consider the relationship, if any, between Grace and Anthony Almonte with respect to the insured property. You must decide whether the plaintiff ... has proved that she is an innocent insured.

An innocent insured is one who was innocent of any wrongdoing in connection with the fire or vandalism and had no "guilty knowledge of the fire or vandalism," and is entitled to recover on the policy. An insured has, "guilty knowledge of the fire or vandalism" if she deliberately closed her eyes to what would otherwise have been obvious to her.

To defeat liability, the defendant must prove the fire or vandalism is traceable to an insured ... it must be shown by defendant that an insured, and in this case we're talking about Grace Almonte, either conspired to set the fire, or caused the vandalism, or knew about it beforehand, or authorized it, or approved it afterward.

But, ... if you find that plaintiff ... was not in fact the owner of the property, but that the true owner was Anthony Almonte, then you must determine whether or not Anthony Almonte participated in, or had guilty knowledge of the fire or vandalism. That is, if you find that Anthony Almonte was the true owner of the property and the fire or vandalism was traceable to him, then you must find for the defendant.

Plaintiff's contention that the instructions were inadequate focuses on a colloquy that took place between the judge, the jury and counsel, following a query received from the jury as to the whereabouts of the deed to the ice cream plant. The deed had not been introduced as evidence as it was conceded that title to the plant was not an issue. The judge asked counsel how they wanted to deal with the query. Plaintiff's counsel asked him to reopen the case to allow introduction of the deed and to have it put on record that defendant conceded that plaintiff was the owner in fee by deed. The judge agreed to both requests. He also told counsel that he would instruct the jury that the existence of the deed did not relieve them of their obligation to determine ownership. The jury was called back to the courtroom but plaintiff's counsel then discovered he did not have an authenticated copy of the deed with him. The judge instructed the jury:

First, let me answer your question you asked about the deed. Whether or not there was a deed to 83 Greenwich Street. Well, the deed as such was not introduced in evidence, but the testimony is uncontradicted that a deed was executed and executed to Grace Almonte. So, there is a deed in her name. Now, title to this property. However, that does not relieve you of the responsibility to decide ownership in keeping with the instructions that I gave you.

Because by this time it was 5:30 p.m. on a Friday evening, it was decided to adjourn until Monday morning. Not, however, before the foreman of the jury had put one further query to the court.

The foreman told the court that the jury was confused by the inclusion of the names Continental Foods and Fairway Foods on several of the documents, and asked whether they had to take account of those names in determining ownership. Judge Pettine responded:

Heed what I've told you. You asked about the deed. This property is in the name of Grace Almonte.... In the instructions I said it does not relieve you, however, of determining the ownership of the property. That is, as between Grace Almonte and Anthony Almonte. You get my point?

The foreman replied: "Yes." At that point the jury was excused. The judge said he would wait until Monday to decide whether to reinstruct on that phase of the case, and told counsel for both sides that he would give them an exception on the record. The deed was not introduced on Monday and the jury returned to its deliberations without further query or instruction. Plaintiff now maintains that she suffered a manifest injustice when the deed was not introduced or the jury reinstructed on ownership because the jury's queries showed that it was hopelessly confused on this issue.

We agree that the jury's questions showed it was confused as to ownership. A good part of the confusion, however,

resulted from the tangled and confusing web of circumstances inherent in the case. In light of plaintiff's concededly valid title, it is arguable whether the issue of ownership should have been charged to the jury at all, the real issue being guilty knowledge. Plaintiff's counsel, however, did not object to the instructions after they were given as required under Federal Rule of Civil Procedure 51 and cases of this circuit. *See, e.g., Emery Waterhouse Co. v. Rhode Island Hospital Trust National Bank,* 757 F.2d 399, 411 (1st Cir.1985); *Campana v. Eller,* 755 F.2d 212, 216 (1st Cir.1985). In fact, plaintiff's counsel agreed expressly that, with some minor modifications not relevant here, the court should give the same charge as was given in the first case. *See* n. 1. This is understandable because in that case the jury returned a handsome verdict for the plaintiff.

The only instruction that plaintiff's counsel specifically requested on ownership came during the colloquy after the jury's query about the deed. Counsel stated: "I think it should be put in the record that the defense has conceded that she is the owner in fee by deed of the property." The jury was instructed to that effect.

■ Our system of justice, for better or worse, is based on the adversarial system. Plaintiff's counsel had an opportunity to submit a requested instruction on ownership and insurable interest prior to the charge, which he failed to do. He failed to object to the instructions after they were given. And on Monday morning, after the weekend recess, he again failed to submit a requested instruction on ownership and insurable interest. Under these circumstances, plaintiff has forfeited her right to object to the instructions and the court's answers to the jury's queries.

■ Nor do we find this an appropriate case for the application of the plain error exception. As we held in *Morris v. Travisono,* 528 F.2d 856 (1st Cir.1976), the plain error exception to Rule 51 must be applied sparingly and only in exceptional cases or

under peculiar circumstances to prevent a clear miscarriage of justice. 528 F.2d at 859. We there endorsed the views of Professors Wright and Miller that "if there is to be a plain error exception to Rule 51 at all, it should be confined to the exceptional case where the error has seriously affected the fairness, integrity or public reputation of judicial proceedings." 9 C. Wright & A. Miller, Federal Practice and Procedure § 2558 at 675 (1971). *See also McKinnon v. Skil Corporation,* 638 F.2d 270, 273 n. 2 (1st Cir.1981). This is not such an exceptional case.

## II. THE ADMISSION OF OFFICER WOOD'S TESTIMONY

■ Defendant called Wood, who was a member of the Providence Police Department Arson Squad, to testify as an expert on arson. Wood was also the police officer assigned to investigate the source of the fire once it was determined to be of suspicious origin. Wood testified that he interviewed a number of witnesses in connection with his investigation, including Andy Acciaioli, a former business partner of Anthony Almonte. When Wood was asked, "And what information did you obtain from Mr. Acciaioli?" plaintiff's counsel objected. The court allowed the question to be answered on the grounds that Wood, as an expert witness, was being asked to detail the underlying facts for his opinion that the fire was caused by arson.

Wood testified that Acciaioli told him that he had terminated his business involvement with Anthony because "he didn't like the way things were being run." Wood further testified that Acciaioli told him that Anthony had been obtaining paper stock[2] from various small operations throughout the New England area which could not be used for packaging ice cream because the stock did not have the Fairway Foods code printed on it. The clear implication of this statement was that the paper stock was obtained for use as fuel for an intended fire. Plaintiff contends that Judge Pettine erred in admitting Wood's

---

**2.** The paper stock was purportedly to be used to make ice cream containers.

testimony concerning Acciaioli's statements. She concedes that the comments about the uselessness of the paper stock were thoroughly rebutted, but claims that she was prejudiced by the comments because they stood as the single piece of evidence tending to refute her claim that she owned all the paper stock in the plant.

Federal Rule of Evidence 703 governs the admission of an expert's opinion, such as that of Wood. The rule provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The notes of the Advisory Committee to the rule state that the facts or data upon which expert opinions are based may, under the rule, be derived from three possible sources: firsthand observation of the witness with opinions based thereon allowed; presentation at trial, *i.e.*, a hypothetical question or having the expert attend trial and hear the testimony establishing the facts; and presentation to the expert outside court and other than by his own perception. The Advisory Committee emphasizes that the rule requires that the facts or data "be of a type reasonably relied upon by experts in the particular field" and that this part of the rule is designed to prevent enlarging the category of permissible data to break down the rules of exclusion unduly.

This court recognized the importance of the requirement that the expert's reliance on the facts or data be reasonable in *American Universal Insurance Co., et al. v. Falzone*, 644 F.2d 65 (1st Cir.1981). We held there that the requirement was "a matter requiring the district court's careful consideration," but found it satisfied in that case, where a state fire marshall testified that his opinion was based on the contemporaneous and on-the-scene opinions of other investigators on his team. *Id.* at 67.

On its face, defense counsel's question concerning the information Wood obtained from Acciaioli was admissible under Rule 703. It was perfectly reasonable to suppose that Anthony's former business partner could have told Wood something relevant to the origin of the fire, *e.g.*, if he had some knowledge about the peculiar combustible nature of the ice cream paper stock or knew of a problem with part of the machinery which could have contributed to the fire. We find, however, that the court erred in failing to conduct a more extensive preliminary investigation into the substance of Wood's conversations with Acciaioli.

The circumstances of this case required a more extensive preliminary investigation than might ordinarily have been required. This was because Wood was not simply an expert on arson, but also the police officer charged with determining who started the fire. It was, therefore, important for the trial judge to ensure that Wood did not stray from explaining why he thought the fire was incendiary in origin to explaining who he thought might have started the fire. Acciaioli's statements clearly fell into the latter category. His opinion of Anthony's business practices had nothing to do with the cause of the fire and, though his statements about Anthony gathering stock might be relevant to the origin of a fire in some circumstances, the record shows they were not relied upon by Wood in that way. Wood had already testified that he based his conclusion that the fire was incendiary in origin on the fact that it had started in several places almost simultaneously. In other words, Wood decided the fire was incendiary on the basis of the physical evidence at the plant and not on the basis of what Acciaioli or any other witness told him.

■ We find, however, that plaintiff's counsel waived his objection to the admission of this evidence by not asking for an offer of proof before Wood testified and/or not moving to strike the hearsay statements after Wood had testified.

We also conclude that the admission of this testimony was harmless error. Plaintiff's contention that she was prejudiced because this was the only evidence suggesting that she did not own all the paper stock in the plant is not persuasive. There was so much evidence of Anthony's extensive involvement in the insurance, transfer and operation of the plant, that it strains common sense to suppose that the testimony that he bought paper stock could have altered the jury's perception of who owned what in any significant way.

## III. THE DENIAL OF THE MOTION FOR A NEW TRIAL

A motion for a new trial is only warranted if the verdict was "so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice," *Wallace Motor Sales, Inc. v. American Motors Sales Corp.*, 780 F.2d 1049, 1063 (1st Cir.1985) (quoting *Valm v. Hercules Fish Products, Inc.*, 701 F.2d 235, 237 (1st Cir.1983)). As shown by the record, the circumstances of both the fire and the vandalism in the present case were shrouded in suspicion. We, therefore, find ample evidence to support the jury's verdict; there is no hint of any miscarriage of justice.

*Affirmed.*