Michael B. SHANE, Plaintiff, Appellee,

v.

James H. SHANE, et al.,
Defendants, Appellants.

No. 89–1115.

United States Court of Appeals,
First Circuit.

Heard June 8, 1989.

Decided Dec. 20, 1989.

Kenneth A. Cohen with whom A. Lauren Carpenter, Goodwin, Procter & Hoar, Stephen S. Young and Sherburne, Powers & Needham, Boston, Mass., were on brief for defendants, appellants.

Donald R. Ware with whom Michael B. Keating, Bruce R. Parker and Foley, Hoag & Eliot, Boston, Mass., were on brief for plaintiff, appellee.

Before BREYER and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

CAFFREY, Senior District Judge.

The defendants-appellants James Shane, Jimmy Ip, and Charles Lee challenge an

* Of the District of Massachusetts, sitting by desig-   nation.

adverse jury verdict in the United States District Court for the District of Massachusetts [1] awarding $1,259,000 in damages to the plaintiff-appellee Michael Shane. The appellants raise a number of detailed factual and legal issues on appeal which, for clarity, may be consolidated into three arguments. First, the appellants claim that there is insufficient evidence to support the jury's finding of damages—specifically, the valuation of stock in a closely-held corporation. Second, the appellants argue that the district court improperly allowed the jury to consider certain evidence of stock dilution in reaching its verdict. Third, the appellants challenge the sufficiency of evidence and legal basis for several federal security law claims. While these arguments require a rigorous examination of the record in this case, we find none of them persuasive, and, accordingly, we affirm the jury's verdict.

## I.

This case presents the story of "Faded Glory." [2] In 1973, the plaintiff Michael Shane, his brother James Shane, and a Hong Kong clothing manufacturer Jimmy Ip agreed to enter into the business of selling faded "fashion" blue jeans in the United States. The jeans would be manufactured by Ip's Hong Kong company Kapok Garments, Ltd. ("Kapok"). The jeans would then be imported and distributed in the United States by a company managed by the Shane brothers. This American company would be jointly owned by the Shanes and Ip. The name of their company was Appendagez, Inc. ("Appendagez"). The label on their jeans was "Faded Glory."

The first years of Appendagez were brilliantly successful. By 1976 the annual sales of "Faded Glory" jeans and apparel had reached $55 million and earnings were in excess of $3 million a year. Appendagez employed some 500 people including a sales staff of more than 200 people. After only a few years, "Faded Glory" jeans were a major producer in the American jean apparel market.

This rapid growth, however, almost immediately created problems between Kapok and Appendagez. Appendagez's sales people were taking in orders at a rate approaching $100 million in merchandise a year. But Kapok, which was the only manufacturer of "Faded Glory" jeans, failed to meet the increasing demand. Instead, Kapok started supplying its jeans to Bang Bang Fashions, a company formed by Ip to distribute jeans in Southeast Asia.

Kapok also increased its prices thereby reducing Appendagez's marginal profit. Starting in 1973, Appendagez made a 40 percent marginal profit between the cost of jeans imported from Kapok and the price of the jeans distributed to retailers. By the late 1970s, increased costs from Kapok shrunk Appendagez's marginal profit to roughly 14 percent. Appendagez started to lose money—$8 million in net losses for 1978 alone.

At that point, Appendagez had become a family business. Michael Shane was responsible for sales and marketing. James Shane was in charge of dealing with Kapok, travelling frequently to Hong Kong to discuss pricing and production with Ip. Thomas Shane, another brother, worked for Appendagez and became a director. Appendagez also employed the Shanes' sister Sandy, their mother, and stepfather.

As of 1978, the ownership of Appendagez remained split between Michael Shane, James Shane, and Ip. Of the 100 outstanding shares in Appendagez, Michael owned 56, James owned 24, and Ip owned 20. Over the next year, the ownership structure of Appendagez underwent several shifts culminating in Michael's complete withdrawal from the company.

Near the end of 1978, Michael Shane decided to pursue an interest in managing

1. Honorable John J. McNaught, United States District Judge presiding.

2. In reviewing the facts of this case, we note that the appellants' primary objections on appeal challenge the sufficiency of evidence for the jury's verdict, and, consequently, we shall recount the evidence presented at trial in a light most favorable to the plaintiff-appellee Michael Shane. *See infra* section II, IIIB.

a public policy institute in New York. Michael agreed to relinquish managerial responsibilities to his brother James, and Michael became a consultant for Appendagez. Michael also agreed to sell a portion of his stock to Ip, but he did not relinquish family control of Appendagez.

In January 1979, Michael Shane negotiated and executed an agreement to sell 30 shares of Appendagez stock to Ip. The price per share was just under $42,000, and the total price was $1.25 million. Under the agreement, Michael would receive the money in four annual installments with the shares held in escrow as security. Following this agreement, Ip owned half of Appendagez, and the Shane brothers owned the other half.

Later in 1979, the business relationship between Michael and James Shane soured. The two brothers disagreed over Michael's claim for $550,000 in commissions owed to him by Appendagez. The two brothers also began to negotiate a separation of their interests in jointly-owned commercial real estate in Norwood, Massachusetts. Throughout 1979, Michael received no financial information concerning the business operations of Appendagez.

During this same time, James Shane and Ip took strides to shore up Appendagez. James Shane and Ip had discussions with Appendagez's bank, the New England Merchants National Bank ("the New England Bank"), and agreed to infuse new capital into the business. As part of these discussions, Ip pledged to capitalize $2 million in debt owed by Appendagez to Kapok which would create more security for the New England Bank's loans to Appendagez. James Shane also reported to the New England Bank that he expected the coming year to be profitable.

In August of 1979, the rancor between Michael and James Shane flared again. Michael, still a director, shareholder, and personal guarantor for debts in Appendagez, approached James about certain credit memos that Appendagez had issued to customers for defective goods. Michael was concerned that the credit memos interfered with Appendagez's security for loans to the New England Bank. In response, James fired Michael as a consultant and fired their sister Sandy who had given Michael copies of the credit memo.

Following this incident, James Shane called a special meeting of the Appendagez board of directors to restructure the company. At the meeting in September, Michael Shane and Thomas Shane were removed as directors and replaced by Ip and his attorney Charles Lee. The new board of directors authorized an increase in the number of shares in Appendagez from 100 to 5,000. The new board also voted to sell 1,000 of the new shares at $500 per share. Michael Shane was offered 260 shares, corresponding to his previous 26 percent interest in Appendagez, but he declined, and Lee purchased all the new shares. Following the special meeting, Michael Shane renewed negotiations to sever all ties with his brother James and Appendagez.

During these negotiations in October, James Shane, Ip, and Lee made plans for further changes in Appendagez. On October 22, all the shareholders in Appendagez, except Michael Shane, met with all the shareholders in Kapok. The parties agreed that Kapok would acquire all of Appendagez's stock in exchange for Kapok stock. The parties promised to reallocate the interest in Kapok and Appendagez as follows: James Shane would get an 8 percent interest in Kapok for his 2 percent interest in Appendagez; Lee would get 12 percent of Kapok for his 91 percent of Appendagez; and Ip would get 38 percent of Kapok for his 5 percent of Appendagez.[3] The parties memorialized their understanding in a signed agreement.

On November 1, 1979, the negotiations between Michael and James Shane culminated in a settlement meeting. At this meeting, James told Michael that the September board of directors' meeting was necessary to save Appendagez. James told

---

**3.** This agreement made no provisions for allocating any interests to Michael Shane despite his outstanding interest in Appendagez. Other individuals, not parties to this action, were to own the remaining interest in Kapok.

Michael the company was broke, that Ip was broke, and that Lee was investing the new money. James Shane said he was reorganizing the company to save the livelihood of workers in Hong Kong. In negotiating the price of Appendagez stock, James Shane said his shares were worth virtually nothing. In response, Michael Shane agreed to give James a 10 percent greater interest in their jointly-held commercial real estate. Michael also agreed to sell his remaining 26 shares of Appendagez stock for $50,000—just under $2,000 per share. These details were memorialized in a settlement agreement which was executed the next day on November 2, 1979.

Throughout the settlement negotiations, James Shane did not disclose the October 22 agreement to consolidate Appendagez and Kapok. James Shane also did not disclose Ip's pledge to recapitalize $2 million of Appendagez's debt to Kapok. Michael Shane only discovered these facts several years later following litigation.

Following the November settlement agreement, James Shane, Ip, and Lee continued their plans to restructure Appendagez. In December 1979, they formed SIL Imports, Inc. ("SIL"), the corporate name representing the first letter of their surnames, to continue Appendagez's business. In June of 1980, James Shane, Ip, and Lee caused the "Faded Glory" trademark to be assigned to SIL. In 1982, the "Faded Glory" trademark was licensed to Global Industries, Inc., of which James Shane was chairman and 40 percent stockholder.

In 1982, the plaintiff Michael Shane commenced this action alleging that the defendants James Shane, Ip, and Lee conspired to defraud Michael Shane of his interests in Appendagez. Specifically, Michael Shane alleged that the defendants, by failing to disclose information and making false representations, caused him on November 2,

1979 to sell his remaining 26 shares in Appendagez at less than their fair value. The Amended Complaint sought recovery of damages for common law fraud, violation of fiduciary duty in a closely-held corporation, and violations of sections 10(b), 20(a), and 20(b) of the Securities Exchange Act of 1934.[4]

Following extensive discovery, the case came before a jury in February of 1988. James Shane and Michael Shane testified at trial, and the plaintiff offered the deposition testimony of Ip and Lee, neither of whom were present at trial. Two expert accountants and an officer of the New England Bank also testified. At the close of the plaintiff's evidence and at the end of the trial, the defendants moved for a directed verdict. The district court denied both motions.

After deliberations, the jury entered a verdict for the plaintiff on all four counts. The jury answered 22 special interrogatories. In their answers, the jury found, among other things, that the defendants had made false material statements and omissions to the plaintiff, breached their duty of loyalty as shareholders in a closely-held corporation, and carried out a scheme to defraud the plaintiff by causing him to sell his 26 shares of Appendagez stock below their fair value. The jury calculated the difference between the fair value for the shares and the actual price paid for the shares to be $1,259,000 based on a value of $52,230 per share.[5]

The defendants filed motions for judgment notwithstanding the verdict and for a new trial. The district court denied both motions, and the defendants James Shane, Ip, and Lee now appeal.

## II.

At the outset, we must frame the standard of review for the appellants' numer-

---

4. Codified at 15 U.S.C. §§ 78j, 78t.

5. In reaching this verdict, the jury made certain calculations which were verified by the court following deliberations. See Trial Transcript, Vol. 11, pp. 10–13. The jury valued each share at $52,230 for a total value of $1,357,980 for 26 shares. Then the jury subtracted the purchase price of $50,000 which Michael Shane received as part of the November 2, 1979 settlement agreement. Further, the jury subtracted an additional $49,000 in forgiven indebtedness which was also part of the settlement agreement. Thus, the jury rounded the net verdict to $1,259,000.

ous claims. The appellants throughout their brief alternatively, and with some confusion, ask either for reversal of the jury verdict or for a new trial on certain issues. While similar, the standards for reviewing each challenge are distinct.

In reviewing the jury verdict, "[w]e are compelled ... even in a close case, to uphold the verdict unless the facts and inferences, when viewed in a light most favorable to the party for whom the jury held, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have arrived at this conclusion." *Chedd–Angier Production Co. v. Omni Publications Int'l Ltd.*, 756 F.2d 930, 934 (1st Cir.1985). *See also Rodriguez v. Montalvo*, 871 F.2d 163, 165 (1st Cir.1989) (citing *Chedd–Angier Production Co.*); *Castro v. Stanley Works*, 864 F.2d 961, 963 (1st Cir.1989) (same); *Brown v. Freedman Baking Co., Inc.*, 810 F.2d 6, 12 (1st Cir. 1987) (same). Thus, in this case, the appellants must "persuade us that the facts of this case so conclusively point to a verdict in [their] favor that fair-minded people could not disagree about the outcome." *Chedd–Angier Production Co.*, 756 F.2d at 934.

In reviewing a request for a new trial, "the appellant[s] must show that the verdict was 'so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice.'" *U.S.I. Properties Corp. v. M.D. Construction Co., Inc.*, 860 F.2d 1, 10 (1st Cir.1988), *cert. denied, Compania de Dearrollo Cooperative v. U.S.I. Properties Corp.*, —— U.S. ——, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989) (quoting *Jordan v. United States Lines, Inc.*, 738 F.2d 48, 49 (1st Cir.1984)). *See also Milone v. Moceri Family, Inc.*, 847 F.2d 35, 37 (1st Cir.1988). The appellants are not entitled to a new trial merely because the evidence would support the opposite verdict or where the court may have reached a contrary result. *Freeman v. Package Ma-*

*chinery Co.*, 865 F.2d 1331, 1333–34 (1st Cir.1988); *Chedd–Angier Production Co.*, 756 F.2d at 934 (citing *Peterman v. Indian Motorcycle Co.*, 216 F.2d 289, 292–93 (1st Cir.1954)). In light of these rigorous standards, we shall now discuss the appellants' specific claims.

### III.

The first issue presented by this appeal is whether the evidence presented at trial supports the jury's finding that the plaintiff's stock was worth $52,230 per share on November 2, 1979.[6] The appellants argue that the evidence presented at trial was insufficient to support any finding of harm, and the district court erred in not entering judgment on their behalf notwithstanding the jury verdict. Alternatively, the appellants claim that the jury's verdict was excessive, and the district court erred in not granting a new trial for a redetermination of damages. We address each contention separately.

### A.

To begin, we consider the appellants' claim that there is no evidence at all supporting a finding of harm to the plaintiff. Specifically, the appellants object to the admission of Michael Shane's opinion testimony as to the value of the Appendagez shares on November 2, 1979. Generally, the appellants argue that the various transfers and valuations of Appendagez stock do not present any evidence of harm to Michael Shane. These contentions, however, have no merit.

First, Michael Shane's opinion testimony was properly admitted within the district court's discretion. A "trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co*, 370 U.S. 31, 35, 82 S.Ct.

---

**6.** At the outset, we note that the appellants have raised a number of objections to the jury verdict. Appellants, however, ask for reversal and/or a new trial at several points in their argument without offering any clear distinction as to what district court action is being challenged or the specific standard of review to apply. In fairly assessing the appellants' appeal, we have attempted to sort out appellants' arguments and have categorized their objections in the following format.

1119, 1122, 8 L.Ed.2d 313 (1962). *See Apostol v. United States*, 838 F.2d 595, 599 (1st Cir.1988); *United States v. Hoffman*, 832 F.2d 1299, 1310 (1st Cir.1987). Under the Federal Rules of Evidence, an expert qualified by "knowledge, skill, experience, training, or education" may offer his opinion if "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue." Fed.R.Evid. 702. The rule encompasses "not only experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values." Fed.R.Evid. 702 Advisory Committee's Notes. Thus, this court has held that the owner of a company is competent to testify as to its value based on "substantial personal familiarity with the property." *Robinson v. Watts Detective Agency*, 685 F.2d 729, 739 (1st Cir.1982), *cert. denied, Consolidated Service Corp. v. Robinson*, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983) (witness was founder, president and majority or near-majority stockholder of company for more than 20 years). Furthermore, in testifying as to the value of his property, an owner is entitled to the privileges of an expert. *See id.* at 739; *United States v. 10,031.98 Acres in Las Animas Cty., Colo.*, 850 F.2d 634, 636 (10th Cir.1988). The accuracy of an owner's testimony, however, only goes to the weight, not the admissability of such evidence. *Robinson*, 685 F.2d at 739. In light of these standards, the appellants' objections to Michael Shane's opinion testimony fail to show any abuse of discretion by the district court.

The appellants' claim Michael Shane had no access to financial information during 1979, and, therefore, he had no foundation to offer an opinion as to the value of his stock on November 2, 1979. Appellants, however, fail to recognize that the trial took place in 1988, and Michael Shane had an opportunity to review and, in fact, to discover the relevant financial information concerning Appendagez for the year 1979. Even if he had testified without knowledge of Appendagez's financial condition in 1979, appellant's objections only address problems concerning the accuracy of Michael Shane's testimony, not its admissibility. Michael Shane was the founder, chief manager, a director, and either a majority shareholder or a minority shareholder in Appendagez from 1973 to 1979. Michael Shane testified that he was intimately aware of the business operations and sale of Appendagez throughout those years. Clearly, Michael Shane had "specialized knowledge" based on his "experience" which qualified him to testify as to the value of Appendagez. Fed.R.Evid. 702.

Further, the appellants argue that Michael Shane's opinion as to the value of Appendagez's shares was subjective, inconsistent with other facts presented at trial, and "plucked out of the air." Again appellants' arguments fail to raise genuine questions given the trial court's discretion in reviewing expert testimony. Michael Shane's testimony was, in fact, consistent with his sale of stock in January 1979 and with James Shane's subsequent valuation of Appendagez stock.[7] The fact that Michael Shane may have a personal interest in valuing the stock or that the appellants offered testimony which differed from Michael Shane's testimony only raises questions concerning the accuracy and credibility of his testimony. As to the admissibility of Michael Shane's testimony, the district court clearly acted within its discretion in allowing the jury to hear his opinion as to the value of Appendagez stock on November 2, 1979.[8]

■ Second, viewed in a light most favorable to Michael Shane, we find ample

---

**7.** In April 1979, James Shane submitted a personal financial statement to the New England Bank valuing his 24 shares in Appendagez at $1 million, or about $42,000 per share.

**8.** In their brief, the appellants argued that the jury verdict must be supported by expert testimony and that Michael Shane's opinion did not satisfy this requirement. *See* Appellants' Brief at 25–27. We need not reach this question, however, as Michael Shane was competent to testify as to the value of Appendagez stock.

evidence supporting a finding of harm by the jury. As of 1978, Appendagez was a closely-held corporation with its 100 authorized shares owned by Michael Shane (56 shares), James Shane (24 shares), and Ip (20 shares). In January 1979, Michael Shane sold 30 shares of Appendagez stock to Ip for roughly $42,000 per share. Throughout the coming year, James Shane withheld all information concerning the financial operations of Appendagez. In September 1979, James Shane, Ip, and Lee removed Michael Shane as a director of Appendagez, and, representing that Appendagez was broke, issued 1,000 new shares for $500 a share. Michael Shane's interest in Appendagez was consequently reduced from a 26 percent interest to a less than 3 percent interest. In November 1979, Michael Shane agreed to sell his remaining shares back to Appendagez for less than $2,000 per share. In negotiating this November sale, Michael Shane was not told of Ip's $2 million pledge to capitalize the corporation. Michael Shane was also not told of the October agreement to consolidate Appendagez and Kapok. Instead, Michael Shane was told that Appendagez was nearly valueless. Clearly, even without further evidence of transfers or valuations, Michael Shane suffered some harm as a result of conduct by James Shane, Ip, and Lee.

Thus, appellants' contention that there is absolutely no evidence of harm belies the standard of review for this case and strains our credulity. The jury's finding as to the amount of harm, however, merits further discussion.

### B.

The appellants next claim that the jury's verdict was excessive and not rationally based on any facts in evidence. The appellants suggest that by plaintiff's own opinion and in relation to previous stock transfers the highest possible value for Appendagez stock on November 2, 1979 was $40,000 per share. In examining this challenge, we must underscore the specific standards for reviewing an excessive jury award.

The inquiry here is limited to whether the verdict was "grossly excessive," "inordinate," "shocking to the conscience of the court," or "so high that it would be denial of justice to let it stand." *Wagenmann v. Adams*, 829 F.2d 196, 215 (1st Cir.1987) (quoting *Grunenthal v. Long Island R.R. Co.*, 393 U.S. 156, 159 n. 4, 89 S.Ct. 331, 333 n. 4, 21 L.Ed.2d 309 (1968)); *Segal v. Gilbert Color Systems, Inc.*, 746 F.2d 78, 81 (1st Cir.1984) (same); *McDonald v. Federal Laboratories, Inc.*, 724 F.2d 243, 246 (1st Cir.1984) (same). Even in cases only involving economic damages, "review must proceed with great deference for the jury's assessment." *Segal*, 746 F.2d at 81. *See also Brown*, 810 F.2d at 11. We also note that "the jury is free to select the highest figures for which there is adequate evidentiary support." *Laaperi v. Sears, Roebuck & Co., Inc.*, 787 F.2d 726, 734 (1st Cir. 1986). *See also Kolb v. Goldring, Inc.*, 694 F.2d 869, 872 (1st Cir.1982). Again, in reviewing this matter, we must consider the evidence in a light most favorable to the plaintiff. *See Wagenmann*, 829 F.2d at 215; *Betancourt v. J.C. Penney Co.*, 554 F.2d 1206, 1207 (1st Cir.1977). Mindful of these standards, we now turn to the evidence presented to the jury in this case.

At the outset, there appears to be ample evidence supporting at least a valuation of $40,000 per share. In January 1979, Michael Shane sold 30 shares of Appendagez to Ip for roughly $42,000 per share. In April 1979, James Shane reported to the New England Bank that his 24 shares of Appendagez were worth just under $42,000 per share. Furthermore, based on his experience and knowledge of Appendagez, Michael Shane testified that in light of appellants' dealings in 1979 his stock was still worth at least $40,000 per share as of November 2, 1979. The appellants, however, attack this prior transfer and opinion testimony as unsupported by the facts. The appellants argue that Michael Shane's interest in January (30 shares of 100 total) was 30 percent of Appendagez, but his interest in November (26 shares of 1,100 total) was only 2.3 percent. Thus, appellants claim, Michael Shane's shares in November 1979 could not possibly be valued

anywhere near their prior value in January 1979. But, as was argued to the jury, the issuance of new shares in September may have been part of a scheme to defraud Michael Shane of his interest in Appendagez. Consequently, the jury was free to disregard the new shares and instead value Michael Shane's interest as if the new issuance had not occurred.[9]

Next, in light of the standard of review, there was also sufficient evidence to support the jury's actual finding that the Appendagez stock was worth $52,230 per share on November 2, 1979. The plaintiff argued to the jury that Appendagez's business position was improving in 1979. The jury heard evidence that in 1979 Ip had pledged to capitalize $2 million in Appendagez debt to Kapok. James Shane had reported to the New England Bank that he expected 1979 to be a profitable year for Appendagez. In October, Appendagez and Kapok had reached an agreement to consolidate ownership, thereby reducing problems of Appendagez's demand for more goods and shrinking marginal profits. One year later, according to an accounting firm audit, Appendagez was projecting a net profit of $1.2 million after taxes.

Added to this evidence of an improving financial future, the jury also heard evidence concerning the past business performance and residual assets of Appendagez. Only a few years earlier, Appendagez was a highly profitable company with earnings in the millions. The sales operation and structure of the company remained intact as of 1979. The jury heard expert testimony that the value of the "Faded Glory" trademark alone was worth roughly $12 million in 1979.

Despite this evidence, the appellants argue that Appendagez was suffering large losses in 1979, was insolvent as of November 2, 1979, and the company's stock was valueless. But the appellants' own conduct in transferring interests in Appendagez and Kapok is further evidence that Appendagez stock had significant value in 1979.

In October, James Shane entered into an agreement with Ip, Lee, and other parties which would give him an 8 percent interest in Kapok in return for 24 shares in Appendagez. At that time, Kapok had valued net assets of roughly $8 million. Thus, James Shane received assets worth about $640,000, or $26,666 per share, for his Appendagez stock.

We agree that this evidence could have supported a finding of stock value lower than what the jury decided in this case. But, we review the evidence presented to the jury in a light most favorable to the plaintiff, not the defendant. *Betancourt,* 554 F.2d at 1207. Further, we shall not disturb a jury's finding on damages unless the verdict is "grossly excessive" and "shocking to the conscience of the court." *Wagenmann,* 829 F.2d 215; *Segal,* 746 F.2d at 81. In upholding the jury verdict, we note that the plaintiff argued, and the jury was free to accept, that the losses in Appendagez were due to the conduct of the defendants who controlled Kapok. Furthermore, as noted above, the jury heard substantial evidence of past business success and future business potential which further bolster the jury award. Thus, reviewed in a light most favorable to the plaintiffs, the evidence presented the jury does support a finding that Appendagez stock was worth $52,230 on November 2, 1979.

### IV.

The next issue presented by this appeal is whether the jury properly heard and evaluated evidence that the appellants issued 1,000 new shares of Appendagez stock in September 1979. The appellants argue that the jury could not rationally have valued Michael Shane's Appendagez stock at $52,230 per share unless the jury disregarded the sale of 1,000 new shares to Lee in September 1979. The appellants contend that, if the new shares were validly issued, Michael Shane's interest in Appendagez as of November 2, 1979 would

---

9. We recognize that the appellants specifically challenge the introduction of this evidence, but, as discussed thoroughly in section IV *infra,* the jury properly heard the evidence of new shares issued in September 1979.

have been only 2.3 percent of the company. Following the appellants' argument, the jury's valuation of Michael Shane's 2.3 percent interest in excess of $1.36 million would make the total value of the company in excess of $58 million. The appellants argue this valuation of Appendagez would be extremely high and out of proportion to the evidence in this case.

This argument, however, is premised on the conclusion that the claim based upon the issuance of 1,000 new shares was improperly heard by the jury. Consequently, we must examine the admissibility of this evidence, and, specifically, we must review the appellants' three legal challenges to the evidence. We shall consider each argument separately.

### A.

The appellants first claim that the cause of action relating to the issuance of 1,000 new shares should have been barred by the statute of limitations.[10] The parties agree that the statute of limitations for the common law fraud and the breach of fiduciary duty claims is three years after the accrual of the cause of action. *See* Mass.G.L. ch. 260, § 2A; *Kirley v. Kirley*, 25 Mass. App.Ct. 651, 521 N.E.2d 1041, *review denied*, 402 Mass. 1104, 524 N.E.2d 400 (1988). Furthermore, the parties agree that the present action was filed on November 1, 1982, less than three years after the sale of Appendagez stock on November 2, 1979. The appellants, however, claim that evidence of 1,000 new shares issued in September 1979 was not part of the common law fraud or the breach of fiduciary duty claims. Instead, the appellants claim that the issuance of new shares was a "distinct event" creating a separate claim for dilution of Michael Shane's interest in Appendagez. Further, the appellants argue that Michael Shane suffered harm from this dilution claim in September 1979 and this

harm occurred more than three years before the commencement of this action in November 1982. Consequently, the appellants submit, the evidence of the newly issued shares should have been time barred.

In responding to appellants' argument, we need not decide whether the issuance of 1,000 new shares in September was a distinct or separate claim for dilution. Under Massachusetts law, "if a person ... fraudulently conceals the cause of [an] action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action ... shall be excluded in determining the time limited for the commencement of the action." Mass.G.L. ch. 260, § 12. *See Maggio v. Gerard Freezer & Ice Co*, 824 F.2d 123, 130–31 (1st Cir. 1987). Furthermore, where the plaintiff owes the defendant a fiduciary duty, the failure to disclose facts tolls the statute of limitations. *Jenkins v. Jenkins*, 15 Mass. App.Ct. 934, 935, 444 N.E.2d 1301 (1983). *See also Burns v. Massachusetts Institute of Technology*, 394 F.2d 416, 419 (1st Cir. 1968).

■ In this case, there was substantial evidence that the appellants fraudulently concealed the facts underlying the claims connected with this lawsuit. The appellants were shareholders in a closely-held corporation and owed a fiduciary duty to Michael Shane, another shareholder. The appellants failed to disclose information concerning Ip's pledge to infuse $2 million in new capital into Appendagez, and the appellants did not give Michael Shane other financial information concerning Appendagez throughout 1979. Furthermore, the plan to consolidate Appendagez and Kapok was never revealed to Michael Shane until years later in the midst of litigation.

■ In addition to this evidence of fraudulent concealment, a specific jury finding in

---

**10.** In their brief, the appellants challenged the appropriate statute of limitations for both the state (Counts II and III) and federal law claims (Counts I and IV) in the Amended Complaint. *See* Appellant's Brief at 31–32, 44–46. As noted in section V below, so long as the jury verdict is based on valid state law claims, we need not discuss appellants' arguments concerning the federal law claims. Thus, for the purposes of judicial economy, we shall only discuss the statute of limitations concerning the common law fraud (Count II) and breach of fiduciary duty (Count III) claims.

this case supports the conclusion that the statute of limitations for any claim was sufficiently tolled until November 1, 1979. Under the Massachusetts discovery rule, an "inherently unknowable" cause of action accrues only when the injured party knew or should have known of the facts underlying the claim. *Maggio*, 824 F.2d at 130 (applying the Massachusetts discovery rule in the context of fraud and breach of fiduciary duty claims). *See also Dinsky v. Town of Framingham*, 386 Mass. 801, 803, 438 N.E.2d 51 (1982); *Franklin v. Albert*, 381 Mass. 611, 618–19, 411 N.E.2d 458 (1980); *Friedman v. Jablonski*, 371 Mass. 482, 485, 358 N.E.2d 994 (1976). After hearing all the evidence, the jury was asked the following special interrogatory.

> Should the plaintiff reasonably have been aware, prior to November 1, 1979 of [the] truth of the facts upon which this lawsuit is based?

The jury answered: "no." Given the applicable Massachusetts law, this factual finding precludes the appellants from raising any statute of limitations objections to Michael Shane's claims.

Thus, no matter how the appellants frame Michael Shane's claims in this lawsuit, the appellants' factual misrepresentations and omissions underlying the September 1979 issuance of new stock sufficiently tolled the statute of limitations and the evidence was not time barred.

### B.

The appellants next argue that the evidence of 1,000 new shares should be excluded by virtue of a settlement agreement releasing the appellants of liability for all actions taken prior to November 2, 1979. The appellants argue that Michael Shane knew about the September 1979 issuance of stock and that a general release he signed on November 2, 1979 should bar him from receiving any compensation based on the issuance of new shares in Appendagez. The appellants' argument, however, fails to address the applicable Massachusetts law and the jury's specific findings in this case.

In the context of a closely-held corporation, a release of all claims signed in conjunction with a sale of stock does not bar subsequent actions where the release was obtained by fraud or misrepresentation. *See Sher v. Sandler*, 325 Mass. 348, 353–54, 90 N.E.2d 536 (1950). Specifically, under Massachusetts law, "where a release is obtained without full disclosure of the relevant facts by one who is under a duty to reveal them, it can be set aside." *Id.* at 354, 90 N.E.2d 536. *See also Gishen v. Dura Corp.*, 362 Mass. 177, 184–85, 285 N.E.2d 117 (1972); *Akin v. Warner*, 318 Mass. 669, 675, 63 N.E.2d 566 (1945); *Reed v. A.E. Little Co.*, 256 Mass. 442, 449, 152 N.E. 918 (1926). Furthermore, shareholders in a closely-held corporation owe one another a duty of "utmost good faith and loyalty" that requires full disclosure. *Leader v. Hycor, Inc.*, 395 Mass. 215, 222, 479 N.E.2d 173 (1985); *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 593, 328 N.E.2d 505 (1975).

In this case, the jury's verdict clearly established that the release does not bar this action. In its verdict form related to Count III, the jury found that "[d]efendants Shane, Ip and Lee were shareholders in a closely-held corporation." The jury was also asked by special interrogatory: "Did the plaintiff sign a general release on November 2, 1979 by reason of misrepresentations or omissions prior thereto by James Shane? James Ip? Charles Lee?" The jury answered "yes" as to each of the three defendants. Given these unchallenged facts,[11] the release of claims signed on November 2, 1979 in conjunction with the sale of Appendagez stock does not prevent the admission of evidence relating to the newly issued shares in September 1979.

### C.

The appellants further contend that the jury should have been instructed that the issuance of new shares was prompted by a

---

**11.** We note that the appellants did not challenge the sufficiency of evidence related to the jury's answers to the special interrogatories, and consequently we accept the jury's findings as undisputed on appeal.

valid business purpose. The appellants argue that James Shane, Ip, and Lee issued the 1,000 new shares to infuse capital into Appendagez as requested by the New England Bank. Further, appellants argue that the district court's failure to give the jury an instruction on this point necessitates a new trial. We, however, disagree.

In reviewing the district court's refusal to give a jury instruction, this court will examine whether the proposed instruction would be confusing or misleading to the jury on controlling issues in this case. *See Lodge v. Shell Oil Co.*, 747 F.2d 16, 19 (1st Cir.1984); *Service Merchandise Co., Inc. v. Boyd Corp.*, 722 F.2d 945, 950 (1st Cir. 1983); *Harrington v. United States*, 504 F.2d 1306, 1315 (1st Cir.1974). Further, "a judgment will not be reversed for error unless the error is determined to have been prejudicial after review of the record as a whole." *Almonte v. National Union Fire Ins. Co.*, 787 F.2d 763, 767 (1st Cir.1986). *See also Brown v. Freedman Baking Co., Inc.*, 810 F.2d 6, 9–10 (1st Cir.1987) (quoting *Almonte* ). In light of these standards, the district court did not err in refusing to give the requested instruction.

■ First, the proposed instruction had great potential to confuse the central issues for the jury.[12] The alleged fraud and breach of fiduciary duty in this case involved factual misrepresentations and omissions by the defendants. The alleged wrongs did not involve a wasting of corporate assets or a violation of the business judgment rule. As originally presented to the district court, the proposed instruction would conceivably cover all corporate actions by the defendants including the alleged misrepresentations and omissions. This invitation to exonerate all the defendants' conduct would likely be confusing and misleading to the jury. In the specific context of this case, the district court did

not err in refusing to give the requested "legitimate business purpose" instruction.

■ Second, even if the appellants were entitled to the instruction, the district court's refusal to give the instruction could not have been prejudicial. The "legitimate business purpose" instruction is only applicable to Count III of the Amended Complaint alleging breach of fiduciary duty. *See Leader*, 395 Mass. at 222, 479 N.E.2d 173. This proposed instruction would not apply to Counts I, II, and IV of the action, and the jury found the defendants liable on each of these alternate claims. Consequently, the refusal to give the proposed instruction could not be prejudicial and could not be reversible error.

In sum, the appellants' argument fails because it is based on a false premise. The evidence concerning the newly issued stock in September 1979 was properly admitted and considered by the jury. The evidence was not barred by the statute of limitations, nor by Michael Shane's release of claims against the appellants. Further, the district court, acting within its discretion, properly refused to give the appellants' "legitimate business purpose" instruction. Therefore, the appellants' attack on the jury verdict as improperly based on the evidence of newly issued shares is without merit.

### V.

Finally, we note that the appellants raise numerous issues relating to the federal security law claims in this case. The appellants challenge the sufficiency of evidence regarding the elements of scienter and materiality in Michael Shane's 10(b) action. The appellants further claim that the federal security law claims were barred by a two-year statute of limitations and that there was no liability under section 20(a) of

---

**12.** The proposed instruction read as follows:

To the extent that the plaintiff claims that the defendants' actions breached their good faith duty to the plaintiff, if you find that the defendants demonstrated a legitimate business purpose for their corporate actions, it is then incumbent upon the plaintiff to establish that the defendants could have achieved the

same legitimate objective through another course of action less harmful to the plaintiff's interest. In applying this standard, however, you should be careful not to impose requirements upon the defendants which would have unduly hampered their effectiveness in managing the corporation in the best interest of the corporation.

the Securities Exchange Act of 1934. This court, however, need not address any of these issues.

The Amended Complaint in this action included state law claims (Counts II and III) as well as federal security law claims (Counts I and IV). As previously discussed, the state law claims for common law fraud and breach of fiduciary duty are supported by sufficient evidence, and the district court did not err in refusing to grant judgment notwithstanding the verdict or a new trial on both these claims. Any of appellants' arguments only addressing the federal law claims would not disturb the jury's verdict, and consequently, we shall not address them.

For the reasons stated above, we affirm the jury's verdict.