BOWNES, Circuit Judge.
 

 Emerson Electric Company d/b/a Chro-malox (Emerson) appeals from a judgment following jury verdict holding it liable for $285,000 in damages suffered by plaintiff International Adhesive Coating Company (International). The jury found that Emerson breached its warranties on an Emerson industrial boiler purchased by International, causing numerous disruptions in International’s manufacturing business. Although disputing liability below, Emerson now defers to the jury finding of liability, but it attacks the damages award on the ground that International’s damages expert’s testimony should have been excluded. Emerson claims that the expert’s testimony was speculative, lacked a factual basis and was, therefore, unduly prejudicial. We affirm.
 

 I. FACTUAL BACKGROUND
 

 Our review of the evidence and the inferences to be drawn therefrom must be made in the light most favorable to the verdict-winner, plaintiff-appellee International.
 
 Service Merchandise Co. v. Boyd Corp.,
 
 722 F.2d 945, 947 (1st Cir.1983).
 

 International is a manufacturer of industrial adhesive products located in Windham, New Hampshire. International buys unfinished film and paper in bulk, applies an adhesive surface to it, then rolls and cuts the resultant tape-like product and sells it. The centerpiece for this manufacturing process is a single large industrial coating and laminating machine, which melts adhesive and then coats it evenly on the paper or film. Heat for melting the adhesive comes from a steam-generating boiler, and, unless the boiler is functioning properly, the entire manufacturing process comes to a halt. It was a defect in International’s boiler which gave rise to the current dispute.
 

 The particular laminating machine used by International is known as a “Park Coa-ter.” It was designed and assembled by Bolton Emerson, Incorporated. International obtained its Park Coater through a lease/purchase agreement with Bolton Emerson Leasing Corporation.
 
 [1]
 
 The machine was delivered and installed at International’s Windham facility in January of 1981. Initially, the Park Coater functioned properly, but within three to four months International encountered a series of problems with the boiler. By mid-1984, International bad experienced a dozen or so breakdowns, each caused by a failure in the electrical heating elements of the boiler and each resulting in a shut-down of its manufacturing process. The shut-downs ranged in length from several hours to an entire work week.
 

 International notified Bolton of its problems with the boiler and Bolton referred it to Emerson, which had actually manufactured the electrical heating elements at issue. Emerson, in turn, put International in touch with Leo C. Pelkus, Incorporated (Pelkus), Emerson’s sales representative. International worked with Pelkus to remedy its boiler problems and tried a number of recommended steps, including water treatment, but none proved effective. International could keep operating only by maintaining a supply of spare electrical heating elements with which to replace the functioning elements when they malfunctioned, which they did at regular intervals.
 

 
 *543
 
 By 1983, the problem had become so acute that International decided to take matters into its own hands. Two steps were initiated. First, International went to an outside electrical equipment sales company to obtain different elements for its boiler. Second, International purchased and had installed a used oil-fired boiler which could be used to provide the necessary steam when the electric boiler was inoperable. The first step alone provided the necessary solution to International’s problems. The outside sales company designed a replacement element which was then built by the Ogden Manufacturing Company. The Ogden element was longer than the original Emerson element and it had a lower power density. Once the Ogden element was installed, the boiler began to function normally and without incident. The replacement oil-fired boiler was also installed and was used, among other things, during the period while the Ogden elements were being manufactured and before they were installed.
 
 [2]
 

 II. PROCEEDINGS BELOW
 

 In June of 1984, International filed a diversity action in United States District Court claiming damages as a result of the defective Emerson boiler. It named as defendants Emerson, Bolton and Pelkus.
 
 [3]
 
 Bolton filed a third-party complaint against Automatic Steam Products Corporation (Automatic), the company which manufactured the boiler shell into which the Emerson elements were inserted. International in turn filed a direct claim against Automatic. International’s basic claims sounded in theories of strict liability, negligence and warranty (express warranty, implied warranty of merchantability and implied warranty of fitness for a particular purpose). International additionally claimed, as a third-party beneficiary, breach of a contract between Pelkus and the other defendants.
 

 The case came on for trial in August of 1987. In pretrial proceedings, the district court dismissed the strict liability, negligence and contract claims against all defendants as well as two of the three warranty claims against Automatic. The remaining warranty claims were put to the jury. International claimed $285,000 from the breach of warranties, which fell into four categories:
 
 [4]
 
 $43,000 for the cost of the original boiler (including costs of repairs); $77,600 for the cost of overhead during the periods when the plant was not operating;
 
 [5]
 
 $145,000 for lost business as a result of the boiler breakdowns; and $19,-000 for the cost of the replacement oil-fired boiler. The damage amounts had been calculated by Stephen Vesey, an accounting expert, who reviewed International’s financial records and prepared a report outlining the documentable costs assignable to each of International’s claimed losses.
 

 On the basis of a pretrial deposition, Emerson moved in limine to exclude Ves-ey’s testimony at trial on the ground that it was speculative and lacked a factual basis. The district court denied the motion, declaring that Emerson’s attacks on Vesey’s knowledge could go to the weight of his testimony, not its admissibility. Vesey was allowed to testify to his damage estimates. Afterwards, Emerson made a second motion to exclude Vesey’s testimony on the same grounds of insufficient knowledge and speculation. This motion was also denied.
 

 The jury returned its verdict on a special verdict form. It found: (1) that the defend
 
 *544
 
 ants had breached their warranties on the Park Coater; (2) that International had been damaged $285,000 as a result of the breach; (3) that International had not misused the product; and (4) that 100% of the damages had been caused by the defective heating elements. Under an indemnity agreement between the defendants, the last finding meant that Emerson was liable for the entire $285,000 verdict. Hence, only Emerson has appealed.
 

 III. ADMISSION OF VESEY’S TESTIMONY
 

 Emerson’s sole claim on appeal is that the district court erred in admitting the testimony of Stephen Vesey, International’s damages expert. According to Emerson, Vesey’s testimony was “sheer speculation” and lacked a factual basis as required by Federal Rule of Evidence 703. Moreover, because of its insufficient factual basis, the prejudicial impact of Vesey’s testimony substantially outweighed its probative force making it excludable under Federal Rule of Evidence 403. Because analysis of International’s claims under the two rules turns on the same issue of factual basis, we consider compliance with the two rules together.
 

 We begin by noting that our standard of review here is a limited one. The admission of expert testimony is a matter reserved to the trial court’s discretion.
 
 Lynch v. Merrell-National Laboratories,
 
 830 F.2d 1190, 1196-97 (1st Cir.1987); 3 J. Weinstein & M. Berger,
 
 Weinstein’s Evidence
 
 ¶ 703[1], at 703-4 (1987). In the absence of an abuse of that discretion or a “clear error” of law, the trial judge’s decision will not be reversed.
 
 DaSilva v. American Brands, Inc.,
 
 845 F.2d 356, 361 (1st Cir.1988).
 

 Rule 703 provides:
 

 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
 

 Closely related to Rule 703 is Rule 705, which provides:
 

 The expert may testify in terms of an opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.
 

 Although when enacted these rules constituted a break with prior practice, their meaning is now well-established. First, an expert is entitled to rely on facts and/or data which have not been admitted into evidence if the expert’s reliance on those facts or data is reasonable.
 
 Almonte v. National Union Fire Ins. Co.,
 
 787 F.2d 763, 770 (1st Cir.1986);
 
 American Universal Ins. Co. v. Falzone,
 
 644 F.2d 65, 66-67 (1st Cir.1981). As noted in Rule 703, such reasonableness is measured against the facts or data upon which experts in the particular field normally rely. This reasonableness determination is “a matter requiring the district court’s careful consideration.”
 
 Almonte,
 
 787 F.2d at 770;
 
 Falzone,
 
 644 F.2d at 67.
 

 Second, if in arriving at his opinion the expert has reasonably relied on facts or data before trial, the basis for the opinion need not be disclosed as a condition to admitting the testimony. The burden is on opposing counsel through cross-examination to explore and expose any weaknesses in the underpinnings of the expert’s opinion.
 
 Coleman v. DiMinico,
 
 730 F.2d 42, 47 (1st Cir.1984);
 
 Knightsbridge Marketing Services, Inc. v. Promociones y. Proyecectos, S.A.,
 
 728 F.2d 572, 576-77 (1st Cir.1984);
 
 United States v. Santarpio,
 
 560 F.2d 448, 455 (1st Cir.),
 
 cert. denied,
 
 434 U.S. 984, 98 S.Ct. 609, 54 L.Ed.2d 478 (1977);
 
 see also Smith v. Ford Motor Co.,
 
 626 F.2d 784, 793 (10th Cir.1980) (the effect of Rules 703 and 705 is to “place the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel’s cross-examination”),
 
 *545
 

 cert. denied,
 
 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981). Moreover, the fact that an expert’s opinion may be tentative or even speculative does not mean that the testimony must be excluded so long as opposing counsel has an opportunity to attack the expert’s credibility.
 
 Payton v. Abbott Labs,
 
 780 F.2d 147, 156 (1st Cir. 1985);
 
 Coleman,
 
 730 F.2d at 46-47. When the factual underpinning of an expert’s opinion is weak, it is a matter affecting the weight and credibility of the testimony — a question to be resolved by the jury.
 
 Pay-ton,
 
 780 F.2d at 156.
 

 With these principles in mind, we have no trouble concluding that Vesey’s testimony was properly admitted under Rule 703. Vesey testified that he derived his damage estimates by reviewing International’s business and financial records and through interviews with company personnel. We think it obvious that these are sources of information normally and reasonably relied upon by accountants, and Vesey testified to this effect as well. The jury was entitled to believe Vesey’s testimony. The verdict demonstrates that it did.
 

 To be sure, Vesey’s description of the underlying documentation was sometimes abbreviated and conclusory, but that went to the weight of his testimony, not its admissibility. Both in the district court and on appeal, Emerson has failed to come to terms with Rules 703 and 705, maintaining that Vesey was obligated, as a condition of admissibility, to present “invoices, statements, documents, breakdown or ... supporting data to support the areas damages that he testified about.” As we have already pointed out, this is contrary to the words of the Rules and the case law. We find it especially significant that, throughout the pretrial period, Emerson had access to all of the International business and financial documents upon which Vesey relied. Emerson also received a copy of Vesey’s report two years before trial. Emerson thus had ample opportunity to investigate, expose and rebut any of Vesey’s allegedly insupportable opinions.
 

 The bulk of Emerson’s arguments against admissibility are simply a rehashing of the central factual disputes of the case dressed up as attacks on the expert’s testimony through Rule 703. Emerson attempts to relitigate the question of whether its defective elements caused
 
 any
 
 harm to International by claiming that Vesey’s testimony lacked a factual basis. For instance, Emerson disputes the fact that International’s loss of business was the result of decreased production due to a defective boiler. Emerr.
 
 i
 
 also argues that International did not actually need to buy a replacement boiler when it could find adequate replacement elements for the electric boiler. These arguments miss the mark because the facts Emerson now contests were not the subject of opinion testimony by Vesey. Vesey is an accounting expert, and it was in that capacity alone that he testified. His role was simply to assign the appropriate dollar amounts to International’s claimed damages.
 

 Vesey is not, and never claimed to be, an expert on the process of manufacturing industrial adhesives. He could not and did not set forth opinions concerning whether the Emerson elements were in fact defective, what effect the defective elements would have on International’s manufacturing or what appropriate remedial steps should have been undertaken. He assumed that the areas of loss claimed by International were valid and legally cognizable ones, and he assigned dollar amounts to the claimed losses based on the financial documents he reviewed. This point was made amply clear in Vesey’s testimony. In response to a cross-examiner’s question concerning whether International in fact needed a replacement boiler, for example, Vesey stated: “I’m in no position to determine whether they had to buy a new boiler or not. All I know is that they bought one and this is what it cost to put it in.”
 

 Vesey’s testimony did not have to establish the validity of the central, disputed factual claims in this case in order to have a factual basis and be admissible. The factual basis for Vesey’s testimony lay in International’s business documents which proved that International spent the stated
 
 *546
 
 sums on boilers and overhead and in financial information which established what particular sales accounts would have been worth to International if they had not been lost (for whatever reason).
 
 [6]
 

 In order to prevail in this action, International had to present evidence tending to establish the disputed facts that Vesey assumed. It needed to supply evidence showing that lost profits and overhead, as well as the need for repairs and a second boiler, were indeed caused by the defective Emerson boiler. The verdict demonstrates that the jury found sufficient evidence to support International’s claims to that effect and, having independently reviewed the record, we agree. International presented testimony concerning each of the following key points: that its manufacturing was shut down in excess of twenty days during the period at issue; that these shutdowns prevented International from making adhesive products it would otherwise have sold; that the shutdowns depleted International’s inventory and disrupted sales agreements with buyers; that as a result of International’s failure to supply, five buyers stopped doing business with International or at least seriously cut back on their purchases; and that in order to remedy its boiler problems, International both undertook outside repairs of its Emerson boiler and purchased a replacement oil-fired boiler. Emerson and the other defendants introduced evidence to the contrary, and the jury need not have believed International’s claims and supporting evidence. But it chose to do so and its finding of credibility is one to which we must defer.
 

 In sum, we find that under Rules 703 and 705 there was a sufficient factual basis to support Vesey’s testimony and that the district court’s decision to admit the testimony was not clear error.
 

 Our holding is a limited one. It is important to point out that in seeking to exclude Vesey’s testimony in the district court and in attacking the verdict on appeal, Emerson has tendered only one issue for review: whether Vesey’s damages testimony had a
 
 factual
 
 basis. Emerson has not chosen to make the argument that International’s damages claims were invalid as a matter of substantive state
 
 law.
 
 We have serious doubts that International’s damages claims are sustainable under Article Two of the Uniform Commercial Code, which has been adopted in New Hampshire. N.H.Rev.Stat.Ann. ch. 382-A, art. 2. Indeed, we know of no theory of damages for breach of warranty that would entitle a buyer like International, while retaining and using a machine it purchased, to obtain not only a return of the price paid, but the cost of repairs as well,
 
 and
 
 the cost of a replacement.
 
 [7]
 

 
 *547
 
 But Emerson has never challenged International’s damages theory on legal grounds. Emerson did not, for instance, take exceptions to the district court’s jury instruction on damages.
 
 [8]
 
 In fact, in arguing that Vesey should not be allowed to testify about the cost of both boilers, Emerson acquiesced in International’s damages theory, claiming only that International had failed to prove, as a factual matter, that it actually needed the second boiler. Any potential state law argument has been waived as a result of Emerson’s failure to present it to the district court and to raise it on appeal.
 

 The judgment awarding International $285,000 in damages is affirmed.
 

 [1]
 

 . International’s complaint in this action named three separate Bolton Emerson entities: Bolton Emerson, Inc., Bolton Emerson International, Inc., and Bolton Emerson Leasing Corp. For purposes of the issues raised on appeal, however, the distinctions between the entities are not material, and so we refer to them collectively and interchangeably as Bolton.
 

 [2]
 

 . The oil-fired burner remained on the premises after installation of the Ogden elements and was used alternately with the Emerson electric boiler. Because it has turned out to be more efficient than the electric boiler, the oil-fired boiler is now the primary source for steam in International’s manufacturing process.
 

 [3]
 

 . Only Emerson and two Bolton entities were named in the original complaint. The third Bolton entity and Pelkus were added as defendants in amended complaints filed in January of 1985 and September of 1985 respectively.
 

 [4]
 

 . Apparently due to problems of proof, International limited its claim for damages to losses incurred during the period from June 1983 through May 1984.
 

 [5]
 

 . This figure was apparently rounded up to $78,-000 to reach the total claimed damages of $285,-000.
 

 [6]
 

 . Emerson has made much of the fact that, during his pretrial deposition, Vesey was somewhat unsure of the source documents for the report his firm had issued two years previously. Vesey ascribed two reasons for his incomplete knowledge at the time of his deposition: first, an associate who had helped prepare the report had since left Vesey’s firm; and, second, a flood had destroyed a number of copies of the source documents stored by Vesey. In response to complaints by opposing counsel, Vesey went back to International’s facility and reviewed the pertinent documents after the deposition and before trial. At that time, Vesey discovered that his firm’s original report had erroneously overstated the cost of the Emerson boiler by $60,000 because it included enhancement costs actually attributable to other parts of the Park Coater. The damage estimate was thus reduced to the $43,000 testified to at trial. Emerson promotes Vesey’s uncertainty at deposition and this error as grounds for excluding his testimony. But in view of Vesey's second review of the relevant documents and the fact that Vesey was fully familiar with International's records by the time of trial, we cannot say that the deposition, even if it demonstrated Vesey’s insufficient knowledge
 
 at that time,
 
 made it error for the district court to admit Vesey’s testimony at trial. At trial, Emerson used Vesey's deposition testimony for impeachment purposes, as it had a right to do.
 

 [7]
 

 . As the district court instructed the jury, the measure of damages under the U.C.C. for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted. U.C.C. § 2-714(2). Normally, this means that the buyer is entitled to the cost of repair
 
 or
 
 replacement. J. White & R. Summers,
 
 Uniform Commercial Code
 
 § 10-2, at 377 (2d ed. 1980). But while a buyer like International, which repairs and retains possession and use of a machine, is entitled to the cost of repairs, it is not entitled to
 
 *547
 
 return of the price paid or the cost of a replacement.
 
 See
 
 U.C.C. § 2-711 (actions for the price and for cover apply only to rejected goods and goods for which acceptance has been rightfully revoked). International's theory was apparently that it was entitled to the cost of both boilers as incidental or consequential damages under U.C. C. § 2-715. International Brief at 60. Incidental and consequential damages, however, do not go so far as to allow recovery that actually puts a buyer like International in a
 
 better
 
 position (having two functioning boilers instead of one, and paying for neither) than it would have been in but for the breach.
 

 [8]
 

 . Emerson did file post-trial motions for judgment notwithstanding the verdict, remittitur and new trial. These motions allege, in general terms, that International had been awarded improperly duplicative damages covering the two boilers. But the motions did not base this assertion on the U.C.C. or applicable case law. Rather, as in Emerson’s appellate arguments, the claim was a purely factual one, that International had failed to establish that it needed a replacement boiler. In any event, Emerson has not appealed from the district court’s denial of its post-trial motions, premising its current appeal solely on the question of the admissibility of Vesey’s testimony.