UNITED STATES of America, Plaintiff,

v.

Margarita PEROCIER,
et al., Defendants.

Crim. No. 08–243 (JAG/BJM).

United States District Court,
D. Puerto Rico.

June 29, 2009.

**104**

Julia Diaz–Rex, United States Attorneys Office, District of Puerto Rico, San Juan, PR, for Plaintiff.

### OPINION AND ORDER

BRUCE J. McGIVERIN, United States Magistrate Judge.

This case charges a conspiracy to fraudulently obtain Puerto Rico medical licenses for numerous persons who allegedly failed one or more parts of the medical revalidation examination. The government noticed its intent to prove that certain applicants earned failing scores on the revalidation exams through the testimony of expert witnesses Mr. Jay Scheurer and Dr. Steven Klein. (Docket No. 88). Defendants moved to exclude these witnesses pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (Docket No. 117, 173, 204), and the government has opposed. (Docket No. 132, 177, 199). A *Daubert* hearing was held on April 14, 2009, at which Mr. Scheurer testified, and the court heard argument concerning the testimony of Mr. Scheurer and Mr. Klein. (Docket No. 206). This matter was referred to me by the presiding district judge for a hearing and disposition. (Docket No. 140).

### BACKGROUND

The indictment here alleges a scheme involving the revalidation examination which is part of Puerto Rico's medical licensing requirements. As set forth in the indictment, the Puerto Rico Board of Medical Examiners (the "Board"), a Puerto Rico government entity, administered a revalidation examination (the "exam") to applicants seeking a license to practice medicine in Puerto Rico. (Docket No. 1, ¶ 1–3). The exam was composed of three parts: the Basic Skills multiple choice test, the Clinical Skills multiple choice test, and a Practical test conducted in a hospital to test certain practical skills. (*Id.,* ¶ 4–6). Only applicants who passed the first two parts of the exam were eligible to take the Practical test, and applicants were required to pass all three parts in order to satisfy medical licensing requirements. (*Id.*). The indictment charges Margarita Perocier, who was either a Board member or President of the Board from some time in 1998 through June 2002 (*Id.,* ¶ 11), as well as eleven defendants who failed one or both of the first two portions of the examination (the "applicant defendants"). (*Id.,* ¶ 12).

Count One, charging only Perocier, alleges that Perocier and an uncharged co-conspirator, Rafael Jiménez, conspired to commit honest services mail fraud in violation of 18 U.S.C. § 1341 and § 1346 from on or about November 2000 until on or about December 7, 2004. (*Id.,* p. 4, ¶ 2). The object of the alleged conspiracy was to deprive the Board of the honest services of its officials "by causing the United States mails to be unwittingly used by Board officials" to send various correspondence related to, and resulting from, the fraudulent awarding of passing exam scores. (*Id.,* p. 5, ¶ 3). The indictment charges that Perocier and Jiménez devised and executed a scheme to deprive the Board of their honest services for the ultimate purpose of fraudulently awarding medical licenses to unqualified applicants in contravention of the Board's fiduciary responsibilities and duties to ensure that licensed physicians were duly qualified to provide medical services. (*Id.,* p. 5, ¶ 4). In particular, Perocier and Jiménez caused bona fide failing score sheets for the April 2001 and November 2001 administrations of the Basic and Clinical Skills tests to be replaced with false and fraudulent passing score sheets in applicants' files with the Board, either at the request of the applicants or of someone acting on the

applicants' behalf. (*Id.*, p. 6, ¶ 6). This was accomplished by making a photocopy of the bona fide failing score sheet with the passing score sheet of an unsuspecting applicant superimposed over it such that the photocopy contained the name, social security number, and identification number of the failing applicant together with the passing scores of the passing applicant. The indictment alleges twenty-six overt acts taken by Perocier in furtherance of the scheme, generally consisting of Perocier causing the Board to issue various documents to failing applicants. (*Id.*, p. 7–9, ¶ 11).

Count Two, also charging only Perocier, charges that Perocier conspired with uncharged co-conspirator Yolanda Rodriguez to commit honest services mail fraud in violation of 18 U.S.C. § 1341 and § 1346 from April 2001 through on or about February 10, 2004. (*Id.*, p. 10, ¶ 2). The object and manner and means of this scheme are essentially identical to those of Count One, here alleging that Perocier and Rodriguez caused fraudulent passing score sheets to be substituted in the Board files of applicants who failed the November 2001 exam administration and alleging eleven overt acts concerning Perocier and Rodriguez causing the Board to issue various documents to applicants who had failed the November 2001 exam after Perocier helped the applicant obtain a false passing score on that exam. (*Id.*, p. 11, ¶ 4).

Counts Three through Twelve each allege that one of the applicant-defendants conspired with Perocier and, in some instances, other uncharged co-conspirators to commit honest services mail fraud in violation of 18 U.S.C. § 1341 and § 1346. (*Id.*, p. 14–15). The alleged object of the conspiracies was to deprive the Board of the honest services of its employees by causing the U.S. mail to be used for the same purposes described in Counts One and Two. (*Id.*, p. 15, ¶ 3). Through the scheme, Board officials Perocier, Jiménez, and Rodriguez would cause bona fide failing score sheets to be replaced with fraudulent passing score sheets, either at the request of the applicants or of someone acting on the applicants' behalf. (*Id.*, p. 16, ¶ 5). In particular, for defendants [2] Diaz and [3] C. Lugo, Perocier caused the fabrication of

false and fraudulent score sheets for the November 2000 exam administration with a near-passing failing score, which would then be changed to a fraudulent passing score. (*Id.*, p. 16–17, ¶ 6). With respect to defendants [4] H. Lugo, [5] Vargas, [6] O. Jiménez, [7] Cordero, and [8] Gonzalez, uncharged Board official Jiménez created false and fraudulent passing score sheets for the applicant defendants. (*Id.*, p. 17, ¶ 7). For defendants [9] Mora, [10] Santiago, [11] Barbosa, and [ 12] Bulted, uncharged Board official Rodriguez created false and fraudulent passing score sheets for the applicant defendants. (*Id.*, p. 17–18, ¶ 8). With respect to the applicant-defendants, Counts Three through Twelve allege as overt acts that the applicant-defendant "received a regular license to practice medicine in Puerto Rico, knowing that [he or she] had never actually passed the [Basic Skills and/or Clinical Skills tests]." (*Id.*, p. 18–19, ¶ 9).

Counts Thirteen through Twenty-three charge that each of the applicant-defendants committed mail fraud in violation of 18 U.S.C. § 1341. (*Id.*, p. 19, ¶ 2). The scheme to defraud consisted of causing payments to be made to his or her benefit by unsuspecting consumers and health care benefit programs and providers, for medical benefits that could only be performed by duly licensed physicians, while each applicant-defendant knew that he or she was not duly licensed to provide medical services in Puerto Rico because he or she had fraudulently obtained a medical license. (*Id.*, p. 20, ¶ 3).

## LEGAL DISCUSSION

### A. Admissibility Under *Daubert*

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, held that district court judges act as gatekeepers in ensuring that all expert testimony admitted at trial is both relevant and reliable. 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Under *Daubert*, district courts are required to engage in a flexible inquiry to determine the reliability of scientific evidence, considering factors such as whether the theory or technique has been and may be tested, whether it has been subjected to peer review and publication, the known or potential rate

of error, the existence and maintenance of standards controlling the technique's operation, and the "general acceptance" of the theory or technique within the scientific community. *Id.*, at 593–95, 113 S.Ct. 2786. The court does not have to follow any particular procedure in resolving a challenge brought under *Daubert. United States v. Diaz,* 300 F.3d 66, 73 (1st Cir.2002).

The Federal Rules of Evidence were amended to codify the *Daubert* decision and its progeny. *See* Fed.R.Evid. 702 cmt. (2000). In its current form, Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. However, *Daubert* does not require that a party proffering expert testimony convince the court that the expert's assessment of the situation is correct, but rather, "[a]s long as an expert's scientific testimony rests upon 'good grounds (4)27' it should be tested by the adversary process— competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.,* 161 F.3d 77, 85 (1st Cir.1998) (citing *Daubert* ).

*Daubert* and Rule 702 also require that expert testimony carry a heightened degree of relevance. Based on the language in Rule 702 that expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue," courts have explained that such testimony must have "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. The First Circuit has explained that "expert

testimony must be relevant not only in the sense that all evidence must be relevant [under Rule 402], but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz–Troche,* 161 F.3d at 81.

The parties' arguments on the instant motions implicate various aspects of the rules governing the admission of expert testimony. Those rules will be described in more detail herein.

## 1. "Sufficiency" Under Rule 702

Rule 702 requires that expert testimony be "based upon sufficient facts or data." Fed.R.Evid. 702. The Supreme Court has held that, under the sufficiency provision, evidence was properly excluded where the experts' opinions were not sufficiently supported by the studies on which they purported to rely. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 144, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). In *Joiner,* plaintiff attempted to introduce expert testimony linking his cancer to his exposure to PCB chemicals. The experts based their opinions on studies by other scientists, and the Supreme Court affirmed the district court's assessment that the studies did not support the experts' conclusions: (1) an animal study showed that infant—but not adult— mice receiving doses of PCBs much higher than that to which plaintiff had been exposed developed a different form of cancer than plaintiff had developed; (2) an epidemiological study of factory workers found "no grounds" for associating the workers' higher-than-expected cancer rates to PCB exposure; and (3) an epidemiological study of workers in a PCB factory found that their cancer rate was not statistically significant and did not suggest a link between cancer deaths and exposure to PCBs. *Id.,* at 144– 145.

Nonetheless, the First Circuit has repeatedly held that a challenge to the "factual underpinning" of an expert's opinion "is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury." *United States v. Vargas,* 471 F.3d 255, 264 (1st Cir.2006) (citing *Int'l Adhesive*

*Coating Co. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 545 (1st Cir.1988)). Thus, if an expert's opinion is "tentative or even speculative", the testimony need not be excluded so long as the opposing counsel has an opportunity for cross-examination in order to challenge the expert's credibility or expose any weaknesses in the underpinnings of the expert testimony. *Int'l Adhesive Coating Co.*, 851 F.2d at 544–45. *International Adhesive* (a pre-*Daubert* case) rejected a challenge to an accounting expert's damages testimony based on attacking the underlying facts on which his conclusions were based, holding that the challenge concerned weight, not admissibility, of the expert's conclusions. 851 F.2d at 545.

Similarly, the First Circuit in *United States v. Vargas* rejected an argument that the relevant data was insufficient under Rule 702 based on the form in which the underlying data was provided to the expert. 471 F.3d at 264. The court there held that a fingerprint expert's reliance on a fax copy of the fingerprints, rather than the best possible image, was an issue that "goes to the weight, not the admissibility, of his testimony." 471 F.3d at 264 (citing *International Adhesive*, 851 F.2d at 545).

### 2. "Reliability" Under Rule 702

Rule 702 also requires that expert testimony be "the product of reliable principles and methods." Fed.R.Evid. 702. The Supreme Court has made clear that "the test of reliability is 'flexible,' and ... the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–142, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (original emphasis). While "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case", that list includes useful criteria for considering reliability: whether the theory or technique has been and may be tested, whether it has been subjected to peer review and publication, the known or potential rate of error, the existence and maintenance of standards controlling the technique's operation, and the "gen-

eral acceptance" of the theory or technique within the scientific community. *Daubert,* 509 U.S. at 593–95, 113 S.Ct. 2786.

Other types of challenges may not require exclusion of expert testimony on reliability grounds. In *United States v. Nichols*, the Tenth Circuit affirmed the district court's admission, without a Daubert hearing, of expert testimony over the objection that there was a risk of contamination of the items tested in the FBI laboratory. 169 F.3d 1255, 1263 (10th Cir.1999). The court held that a hearing was unnecessary to determine reliability because there was no dispute about the scientific theory or testing methodology, but rather the dispute concerned whether "test results were undercut by flaws in the laboratory tests," which was an issue requiring the jury's determination of witness credibility and weighing of evidence. *Id.*

As to computer data in particular, courts have long held that "[t]he fact that it is possible to alter data contained in a computer is plainly insufficient to establish untrustworthiness." *United States v. Bonallo*, 858 F.2d 1427, 1436 (9th Cir.1988). *See also Floorgraphics, Inc. v. News Am. Mktg. In–Store Servs.*, 546 F.Supp.2d 155, 169 (D.N.J.2008) (rejecting defendants' "attempt[ ] to discredit [expert witness] based on the possibility that the underlying data could be altered" where there was not a "shred" of evidence indicating alteration); *CA, Inc. v. Simple, Inc.*, 02–Civ.–2748 (DRH)(MLO), 2009 U.S. Dist. LEXIS 25242, at *55 (E.D.N.Y. Mar. 5, 2009) ("[t]he mere theoretical possibility that the archive CD could have been altered does not make it inadmissible"). Instead, the possibility that computer data may have been altered is a fact going to the weight of that evidence, not its admissibility. *Bonallo*, 858 F.2d at 1436; *CA, Inc.*, 2009 U.S. Dist. LEXIS 25242, at *55.

### 3. Rule 703

Rule 703 provides that an expert's testimony may be based on inadmissible evidence so long as those facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703.

Following the Supreme Court's *Daubert* decision, the Third Circuit engaged in a lengthy consideration of *Daubert*'s application to Federal Rule of Evidence 703. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 747–49 (3d Cir.1994). The Third Circuit held that Daubert's direction to district courts to play a "gatekeeping function" with respect to expert testimony applied equally to a determination under Rule 703's requirement that the underlying data on which an expert opinion is based is "of a type reasonably relied upon." *Id.*, 35 F.3d at 748. In doing so, "the judge must conduct an independent evaluation of reasonableness" which may take into consideration both the expert's opinion that other experts rely on that type of evidence, as well as any other factors the judge deems relevant. *Id.* As Judge Weinstein characterized the Rule 703 issue (in a view the Third Circuit found "extremely persuasive"), "[i]f the underlying data is so lacking in probative force and reliability that no reasonable expert could base an opinion on it, an opinion which rests entirely upon it must be excluded." *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1223, 1245 (E.D.N.Y.1985).

In the most recent amendments to the Federal Rules of Evidence, the committee further explicates the relationship between Rules 702 and 703. Fed.R.Evid. 702 cmt. (2000). The committee explained that "the sufficiency of the basis of an expert's testimony is to be decided under Rule 702" as part of deciding "the ultimate reliability of the expert's opinion", while "[i]n contrast, the 'reasonable reliance' requirement of Rule 703 is a relatively narrow inquiry." *Id.* The committee stated that while the trial court may determine under Rule 703 that the expert may rely on the inadmissible information, "the question whether the expert is relying on a *sufficient* basis of information—whether admissible information or not—is governed by the requirements of Rule 702." *Id.* (original emphasis).

■ The First Circuit has not dealt directly with Rule 703 in the *Daubert* context. As to Rule 703 generally, the First Circuit upheld a district court's requirement that an expert testify about the "unorthodox" evidence underlying his conclusions in order to aid the district court's assessment of reasonable reliance under the Rule. *Univ. of R.I. v. A.W. Chesterton Co.*, 2 F.3d 1200, 1218 (1st Cir., 1993). *See also United States v. Corey*, 207 F.3d 84, 89 (1st Cir.2000) ("Rule 703 does require that the trial judge act as an independent 'gatekeeper' to ensure that there is sufficient, credible evidence that experts do rely on the specified types of sources in formulating their opinions"). *See also Crowe v. Marchand*, 506 F.3d 13, 18 (1st Cir. Cir. 2007) (medical expert properly relied on medical reports prepared by others because they were "of a type reasonably relied upon by experts in the particular field"). An expert may rely on facts or data that have not been admitted into evidence if the expert's reliance is reasonable as "measured against the facts on which experts in the particular field normally rely." *Int'l Adhesive Coating Co.*, 851 F.2d at 544 (company's financial records and interviews with company personnel were "obvious[ly] sources of information normally and reasonably relied upon by accountants").

### 4. Chain of Custody

■ Challenges to the chain of custody of the underlying data on which expert testimony is based go to the weight, not the admissibility, of the testimony. *United States v. Cartagena–Carrasquillo*, 70 F.3d 706, 715 (1st Cir.1995) ("chain of custody arguments usually go to the weight of the evidence and not admissibility"); *United States v. Moore*, 425 F.3d 1061, 1071 (7th Cir.2005). In *Moore*, the defendant argued that the expert testimony of a forensic chemist was unreliable under *Daubert* because the government failed to establish a chain of custody for the drugs she analyzed. *Id.* The court held that the district court properly admitted the testimony because, in the Seventh Circuit, a perfect chain of custody was not a prerequisite to admission and any gaps in the chain were issues of weight, not admissibility. *Id.*

### 5. Underlying Facts and Data Under Rule 705

Rule 705 provides "the expert may testify in terms of opinion or inference and give reasons therefor without first testifying to

the underlying facts or data, unless the court requires otherwise." Rule 705 implies that the court, in its discretion, may permit an expert to testify to his opinions without "first testifying to the underlying facts and data." Fed.R.Evid. 705. However, Rule 705 relates to "the manner of presenting testimony at trial" and not to the initial determination of admissibility. Fed.R.Evid. 705 cmt. (1993); 4–705 Weinstein's Federal Evidence § 705.06. Moreover, "Rule 705, together with Rule 703, places the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel's cross-examination." 4–705 Weinstein's Federal Evidence § 705.05 (citing *Toucet v. Maritime Overseas Corp.*, 991 F.2d 5, 10 (1st Cir.1993)).

### 6. Rule 403

Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Fed.R.Evid. 403. The Supreme Court cautioned that even if expert evidence is admissible under Rule 702, it may not be admissible under Rule 403. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (courts "should be mindful" of Rule 403 because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it") (internal citation omitted).

Nonetheless, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786. The First Circuit emphasized that it is preferable for admissible expert testimony to "be tested by the adversarial process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Ruíz–Troche*, 161 F.3d at 85 (citing *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786).

### 7. Need for a Hearing

■ The district court has discretion to decide whether a pre-trial hearing is neces-

sary to determining the admissibility of expert testimony. *See, e.g., Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (hearing unnecessary "where the reliability of an expert's methods is properly taken for granted"); *United States v. Diaz*, 300 F.3d 66, 74 (1st Cir.2002) ("trial court has discretion not to hold pretrial evidentiary reliability hearing in carrying out its gatekeeping function"); *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 248 (6th Cir.2001) (under *Kumho*, district court need not hold hearing where parties' briefing and record evidence provide "an adequate basis from which to determine the reliability and validity of the experts' opinions").

### B. Analysis

Defendants challenge each of the government's experts on one or more of the following grounds: (1) Rule 702's requirement that expert testimony be based on "sufficient facts or data," (2) Rule 702's requirement that expert testimony be the product of "reliable principles and methods," (3) Rule 703's rule that expert testimony may be based on inadmissible evidence only if it is "of a type reasonably relied upon by experts in the particular field," and (4) Rule 705's language permitting the district court to require an expert to testify to "the underlying facts and data" prior to giving an opinion or inference. Alternatively, defendants argue that even if the testimony is admissible, the weaknesses as to the underlying facts counsel in favor of excluding the testimony as unduly prejudicial under Rule 403. The government contends that defendants' arguments go to the weight of the evidence, not to its admissibility. (Docket No. 132, p. 5). The government argues that challenges to data based on witness credibility and weighing of evidence are properly in the province of the jury and are not part of the court's preliminary duties under *Daubert*. (*Id.*, p. 6). Defendants' arguments as to each expert witness will be addressed separately.

### 1. Scheurer

The government noticed its intent to offer the testimony of Jay Scheurer. (Docket No.

88). Scheurer would testify that he had analyzed data concerning the November 2000 and April 2001 exams, which the government provided to him in eight files on two floppy disks. For each file, he determined the "date created," "date accessed," and "date modified." (*Id.*).

At the *Daubert* hearing, Scheurer was admitted as an expert witness and his testimony was heard.[1] (Docket No. 206). Scheurer is a special agent and computer forensics analyst employed by the Food and Drug Administration (FDA), a position he has held since May 2002.[2]

Scheurer testified that he analyzed the floppy disks provided by the government using the computer program Access Data Forensic Toolkit ("FTK"), and in particular, the program FTK Imager. The program is used to image and analyze computer media. He testified that the program is the industry standard, used by "virtually every" federal agency. In his view, FTK Imager is "absolutely reliable" and he has never heard of any problem or inaccuracy arising with the program. For these diskettes, he was asked to identify their contents and primarily to identify the dates associated with the files on them. He produced a report of his analyses, identifying certain properties of each file.

The steps he took to analyze the data were: (1) ensuring that the diskette was write-protected by manually flipping a switch on the disk; (2) flipping a switch to make his hardware "read-only" to ensure that he had no capability of altering the data on the disk; (3) pulling up the disk's image using FTK Imager; and (4) running a report of the file properties for each file on the diskettes. For each file on the disk, the report identifies: (1) "date accessed" (the most recent date someone opened or copied the file); (2) "date created" (the date a file was placed on the floppy disk); and (3) "date modified" (the most recent date that the file was modified). Scheurer explained that the date modified could be earlier than the date created if the file was changed on another computer before

being backed up onto the floppy disk. On cross examination, Scheurer explained that he cannot identify the modifications or the extent of modification made to a file, he can only establish that the files were, in fact, modified in some way. A modification could be as simple as printing the document without making any changes to the data, or it could be a change to all the data in a file. Moreover, the properties only identify the last modification, not prior modifications.

As to the files at issue here, Scheurer testified about the August 25, 2008 report he provided to the government. First, he reviewed the November 2000 floppy disk which contained four relevant files. Each was created on December 18, 2000, and modified on December 14, 2000. He explained that this meant that the files were last modified before being placed on the floppy disk. Next, Scheurer reviewed the May 2001 disk. The first file on that disk was modified at 11:11 a.m. on May 18, 2001, and "created"—that is, placed on the floppy disk—at 12:11 p.m., an hour later on the same day. Scheurer concluded that the remaining files were similarly modified a short time before being placed on the floppy disk. Scheurer testified that he had no reason to believe the dates he found in his analysis were inaccurate. On cross examination, he admitted that it is possible for the dates on a floppy disk to be manipulated, and he was unable to rule that out as a possibility here.

Scheurer is not able to determine the program in which the files were written. They have the file extension ".dat," which could pertain to any number of programs. Scheurer stated that floppy disks are still used and are not obsolete. While there are other media available, floppy disks have not been replaced.

### a. Expert Qualifications

At the Daubert hearing, Scheurer testified to his experience and training in computer forensics, and defendants did not object to

---

1. References to Scheurer's testimony are based on the court's review of the audio recording of the hearing.

2. Scheurer testified in detail to his expert qualifications. Defendants have not challenged his qualifications as an expert.

his being admitted as an expert. (Docket No. 204.).

### b. Admissibility of Testimony

A close reading of defendants's briefs reveals that they do not actually challenge the admissibility of Scheurer's testimony. (*See* Docket Nos. 117, 173). Instead, defendants discuss Scheurer's conclusions in the context of their arguments concerning Klein's testimony, which was based on the data analyzed by Scheurer. For example, they argue that because Scheurer cannot testify as to when or how much the data was modified prior to the "date-modified", or identify what modifications were made, the data on the floppy disks is unreliable and therefore *Klein's* expert conclusions based on that data should not be admitted. (Docket No. 117, p. 20). Such an argument attacks Klein's testimony, not Scheurer's. The remainder of defendants' references to Scheurer follow the same pattern. Therefore, since defendants have not raised any objection to the admission of Scheurer's testimony, I find that it is properly admitted under Rule 702.

### 2. Klein

The government noticed its intent to offer Dr. Klein's testimony as to (1) his preparation of answer entries for the November 2000 exam, and (2) his preparation of score listings for the April 2001 exam.[3] (Docket No. 88). As to the November 2000 exam, Klein would testify that the government provided him with a floppy disk containing files containing each candidate's responses to the exam questions (as determined by Scheurer's analysis). Klein already possessed the computer programs he had used to score and analyze the exams in 2000, and he thus analyzed the data and prepared a print-out showing the name, raw score, total score, answer choice selected for each question, correct answer to each question, and other information for certain candidates. (*Id.*). The government explained that, as to the April 2001 exam, the government provided Klein with four data

files on a floppy disk (as determined by Scheurer's analysis), and Klein already possessed the scoring programs which he had used to score the exam in 2001. Klein would testify that the four files contained the responses of the candidates for the morning and afternoon sessions of the Basic and Clinical portions of the exam, and that he cleaned the data and merged the four sets of scores. For certain candidates, he then replicated the analysis he had used in 2001 in order to score the exam.

At the *Daubert* hearing, the government stated that it did not plan to call upon Klein to authenticate or swear to the accuracy of the data that he received from the government. (Docket No. 206). The government conceded that Klein had no personal knowledge as to the raw data on which he based his analysis. (*Id.*). Defendants informed the court that, on the basis of that representation, Klein's testimony was not necessary at the *Daubert* hearing. (*Id.*).

### a. Expert Qualifications

The government set forth detailed information about Klein's qualifications as a witness[4], (Docket No. 199, p. 2), and defendants have explicitly stated that they are not challenging Klein's expert qualifications. (Docket No. 204, p. 3).

### b. Defendants' Challenges to Klein's Testimony

Defendants note that Klein's testimony is based on the data analyzed by Scheurer. They note that Scheurer is only able to identify the date on which the data was last accessed or modified, but cannot testify as to when or how much the data was modified prior to that date, or identify what modifications were made. (Docket No. 117, p. 20). Thus, defendants conclude, the data on the floppy disks is unreliable and Klein's expert conclusions based on that data should not be admitted. (*Id.*).

---

**3.** Klein will also testify to certain additional matters as a fact witness. (Docket No. 206). That testimony is not at issue here.

**4.** The court notes, however, that this information was provided in a footnote to a brief by counsel, not in the form of an affidavit, curriculum vitae, or other admissible evidence.

Defendants further argue that additional facts concerning the data entry and collection process make the data, and thus Klein's testimony, unreliable: (1) the original answer sheets have been destroyed; (2) the government will be unable to establish that the process of collecting the data in 2000 and 2001 was reliable; (3) the government will be unable to establish that the floppy disks identified in 2007 and 2008 are the disks containing the official information pertaining to the 2000 and 2001 exams; and (4) the government will be unable to conclusively establish that the data on the floppy disks has not been altered or modified. (Docket No. 117, p. 14).

Defendants raise various arguments concerning the government's presumed inability to authenticate the underlying data on which the expert conclusions are based, arguing that, as a result, the expert testimony should be excluded. In response, the government contends that a presumption of regularity supports the official acts of public officers and government agencies. (Docket No. 199, p. 5). The government argues that there is "no reason to believe" that any of the original score lists or electronic data used by Dr. Klein have been altered or tampered with. (Docket No. 199, p. 5). They point out that the alleged scheme to defraud was based on fabricating false individual score sheets *after* the original exams were scored by Dr. Klein and the original score listings were delivered to the Board (and more to the point, after the applicant defendants became aware that they had failed the exam and sought to remedy that situation). (Docket No. 199, p. 5). Because the scheme to defraud does not allege the alteration of the electronic data used to score the exams or the score listings thereby produced, the government contends that the presumption of regularity should apply to those sets of data. (Docket No. 199, p. 5).

Defendants argue that reliance on a presumption of regularity is misplaced here because: (1) the government contracted out to non-government employees, Caribbean Data Services, the task of reading the answer sheets; (2) the presumption is rebutted by evidence of deficiencies in the exam administration process; and (3) the presumption is further rebutted by evidence of wide-spread corruption in this particular governmental agency. (Docket No. 204, p. 10).

This issue places the parties in curious positions. Defendants, for their part, observe that evidence establishes that the "state of affairs at the [Board] for the years in question was so corrupt that it will be impossible for the Court to make a finding that the data entry process was reliable and trustworthy." (Docket No. 117, p. 14). The government, in turn, advances an argument that the data should be trusted on the principle that government employees may be presumed to do their jobs properly.

Defendants also raise various arguments concerning alleged issues with the chain of custody. The chain of custody issues for each set of test results analyzed by Klein are as follows.

### (1) November 2000

As to the November 2000 exam data which Klein used to prepare the November 2000 score list, the government offers the following facts: (1) the file properties show (according to Scheurer's testimony) that each file was placed on the disk in December 2000 and was not subsequently modified; and (2) a December 31, 2000 invoice from Caribbean Data Systems describes files created from reading of answer sheets, and the date and file names match those on the floppy disks. (Docket No. 199, p. 9–10).

Defendants argue that with respect to Scheurer's testimony, there remains a five-week gap between the November 15, 2000 exam administration and the last-modified date of December 18, 2000, which is unaccounted for in Scheurer's testimony or any other effort to authenticate the data. Thus, they argue, Scheurer's testimony cannot serve as a replacement for proper authentication. (Docket No. 204, p. 12). Defendants further assert that the government previously produced this disk to them identifying it as one "possibly" containing the November 2000 results, and defendants question the government's sudden certainty that the disk actually contains that data. (Docket No. 204, p. 18).

Moreover, defendants argue that the Caribbean Data Systems invoice must be authenticated, and the invoice itself cannot prove that the disk analyzed by Scheurer is the same one prepared by CDS in 2000. (Docket No. 204, p. 19).

### (2) April 2001

The government asserts that the file properties on the April 2001 disk show (according to Scheurer's testimony) that each file was placed on the disk in May 2001 and was not subsequently modified.[5] (Docket No. 199, p. 11).

Defendants contend that the underlying data concerning the April 2001 results is unreliable due to problems in the chain of custody of the disks containing those exam results (the "April 2001 disks"). (Docket No. 173, p. 4). They note that the government declared in an affidavit that the April 2001 disks were taken from the offices of Board employee Gregorio Diaz (citing Docket No. 117, p. 15), but later contradicted this by asserting that the April 2001 disks were located, pursuant to subpoena, in the office of the Board president. (*Id.*).

### c. Admissibility of Testimony

### (1) Sufficiency under Rule 702

█ Defendants challenge Klein's testimony on the grounds that it is not based on "sufficient facts or data" under Rule 702. While defendants speculate that the underlying data may be untrustworthy based on such issues as authenticity, reliability of the collection process, and chain of custody, they do not make any showing that the data is actually inaccurate or does not support Dr. Klein's conclusions. In particular, they argue that for the data on which Klein's conclusions are based, it cannot be determined whether and how much of that data was modified after it was collected from the answer sheets and before it was analyzed by Klein. They argue that, as a result, the data may be inaccurate or altered and thus provide insufficient support for Klein's conclu-

sions. This analysis stands in stark contrast to cases where courts have found expert testimony not to be based on sufficient facts and data, such as where an expert's attempt to link plaintiff's cancer to his PCB exposure was based on scientific studies that flatly contradicted such linkages or found any proof of such linkage inconclusive. *Joiner*, 522 U.S. at 144–45, 118 S.Ct. 512.

Moreover, courts have rejected similar challenges to the data underlying an expert's conclusion as matters "affecting the weight and credibility of the testimony—a question to be resolved by the jury." *Vargas*, 471 F.3d at 264 (admitting fingerprint expert's testimony over objection that it was improperly based on a faxed copy of fingerprint). *See also Int'l Adhesive* (rejecting challenge to accounting expert's testimony based on facts of damages and loss challenged on qualitative, non-accounting, grounds).

Likewise, here, challenges to the underlying data do not render the expert's testimony insufficient. Defendants' attempt to distinguish *Vargas* on the grounds that the expert there did not "interpret" the data as Klein did is without merit. *Vargas* instructs that any issues about the quality of the underlying data—regardless of the type of conclusions the expert drew from it—goes to weight, not admissibility. 471 F.3d at 264. Similarly, defendants' argument that the underlying data is insufficient because Scheurer could not testify as to the nature or extent of modifications, or because the paper copies of the answer sheets are unavailable, is similar to questioning the faxed copy of a fingerprint in *Vargas* as not the "best possible image" of the print. *Id.* While the "best possible" copy of the test scores here might be a hard copy or an electronic version in which modifications could be more fully tracked, the fact that Klein's testimony is based on that less desirable data set is a matter that "goes to the weight, not the admissibility, of his testimony." *Id.* Thus, these arguments do not require the wholesale exclusion of Klein's testimony, but instead, like the fax copy in

**5.** The government also asserts that a Caribbean Data Systems invoice describes files created from reading of answer sheets, whose date and file names match those on the floppy disks. Howev-

er, the invoice copy filed with the government's brief is a second copy of the December 2000 invoice, rather than the one correlating to the April 2001 exam results. (Docket No. 199).

*Vargas,* they require jury assessment of weight and credibility.

Therefore, Rule 702's sufficiency requirement does not require exclusion of the expert testimony.

### (2) Reliability under Rule 702

 Defendants also argue that a *Daubert* challenge may be based on problems with the factual foundation of the data underlying the expert's opinion. (Docket No. 204, p. 2). Defendants suggest that the government should have called witnesses who could testify to the authenticity and reliability of the data underlying Klein's opinion. (Docket No. 204, p. 3). The government responds that defendants are improperly asking the court to conduct an "expert-less Daubert hearing." (Docket No. 217, p. 3). While defendants' arguments raise concerns of "reliability" as to the underlying data and evidence on which Klein's conclusions are based, those issues are not the ones with which Rule 702 is concerned. Reliability under Rule 702 is a question concerning the expert's methods, not the method of obtaining the underlying data by non-experts. On the other hand, reliability concerns relating to the underlying data generally require a jury's evaluation of witness credibility and weighing of evidence. *Nichols,* 169 F.3d 1255 (admitting testimony where defendants challenged flaws in laboratory procedures allegedly causing contamination of test results on which expert opinion was based).

Defendants point to a First Circuit case where an accounting expert's damages calculations were based on inaccurate underlying data which was contradicted by documentary evidence, and the court held that the expert's conclusions were unreliable and, because the jury had improperly relied on those conclusions in awarding damages, ordered a new trial. *Irvine v. Murad Skin Research Lab.,* 194 F.3d 313, 320–21 (1 st Cir.1999). In particular, the accounting expert had used incorrect sales data in determining the losses to plaintiffs' business based on defendants' impairment of their exclusive distribution right. *Id.* The expert testified that the sales data he used was based exclusively on the representations of plaintiffs' management,

and he did not review any documents to verify the accuracy of the information he was provided. *Id.* However, documents in the record showed that sales of defendant's product accounted for approximately 20% of plaintiffs' sales, thus directly contradicting the expert's assumption that those products accounted for 100% of their sales. *Id.* Accordingly, the court concluded that the "basic premise of the expert's opinion ... [was] flawed" and his testimony was therefore unreliable under *Daubert. Id.*

In this case, defendants' challenges do not rise to the *Irvine* level because defendants do not show evidence of any inaccuracies. Their concerns about the process by which the data was collected and maintained are very different from the situation in *Irvine* in which the data on which the expert relied was directly contradicted by record evidence. Here, defendants have not offered any evidence even suggesting an inaccuracy in the underlying data, let alone clearly demonstrating such an inaccuracy. *See also Crowe,* 506 F.3d at 18 n. 1 (testimony based on reports created by others admissible because, "[i]n any event, the plaintiff has not alleged that the x-ray and MRI reports were in any way inaccurate"). Moreover, courts considering challenges to computer data in particular have routinely held that the mere fact that it is *possible* to alter computer data is "plainly insufficient to establish untrustworthiness." *Bonallo,* 858 F.2d at 1436. Likewise, defendants' speculation, absent of even a "shred" of evidence that the data has been altered, *Floorgraphics, Inc.,* 546 F.Supp.2d at 169, is insufficient to establish that the expert testimony based on that data is unreliable under Rule 702.

Thus, defendants' arguments about the underlying data do not raise questions about the admissibility under *Daubert* and Rule 702, but rather raise questions about the weight of the evidence and testimony that should be decided by the jury.

### (3) Rule 703

Rule 703 is the rule most closely related to the types of issues—admissibility of underlying facts and data—raised by defendants. Unfortunately for them, the gist of Rule 703

does not help their cause. The government invokes Rule 703's provision that expert testimony may be based on inadmissible evidence if it is "of a type reasonably relied upon by experts in the particular field" to argue that Dr. Klein will testify that in scoring the exams, it is standard industry practice for psychometricians to receive the exam data in electronic format, and it is customary for state boards to destroy the hard copy exam answer sheets one year after the exam administration. (Docket No. 199, p. 3). Defendants argue that even if answer sheets are customarily destroyed, the government is not relieved of its obligation to authenticate the process by which hand copies were converted to the electronic data used in the experts' analyses. (Docket No. 204, p. 7). This may be so, but it simply goes to admissibility issues concerning the underlying data that will need to be resolved at trial, and does not defeat the government's reliance on Rule 703 as it relates to the admissibility of Klein's testimony. Defendants have not shown that the practice is unreasonable, and the government purports to show that it is a reasonable, typical industry practice. Assuming that the government can indeed make this showing at trial, Rule 703 serves precisely to protect expert testimony from the concerns of which defendants complain.

#### (4) Authentication

Defendants vigorously argue that the expert testimony is deficient because it is based on underlying evidence that has not been, and cannot be, properly authenticated. However, defendants offer no support for their suggestions that authentication is a proper subject for a *Daubert* inquiry. *Cf. United States v. Lauder,* 409 F.3d 1254, 1264 (10th Cir.2005) ("the admissibility of the [underlying evidence] is governed by the evidentiary rules regarding foundation and authentication, not *Daubert* "). Thus, defendants' authentication arguments do not require exclusion of Klein's expert testimony at this stage.

■ Likewise, defendants' chain of custody arguments are similarly misplaced. As to the disks purportedly containing the November 2000 exam scores, defendants contest that the unaccounted-for "five week gap" between the exam administration and the last-modified date for the files on the disk casts doubt on the reliability of that evidence. Defendants further argue that for both the November 2000 and April 2001 data, the government will be unable to account for the location from which they were taken, who maintained custody of the disks in the intervening years since they were purportedly created, and that the disks are therefore unaltered or even that they are the 2000/2001 exam data files they purport to be. These arguments are not without persuasive force and may portend serious problems for the government at trial. However, arguments concerning chain of custody go to the weight, not the admissibility, of evidence. *See Cartagena–Carrasquillo,* 70 F.3d at 715; *Moore,* 425 F.3d at 1071. Therefore, these arguments are properly put before a jury at trial, not to the court on a *Daubert* motion.

#### (5) Rule 705

■ Defendants invoke Rule 705 to argue that the court should require Klein to testify to the underlying facts and data before testifying to his opinions. However, this argument misconstrues Rule 705. First, the plain language of the rule permits precisely the opposite of what defendants urge: "[t]he expert may testify in terms of opinion . . . without first testifying to the underlying facts or data." Fed.R.Evid. 705. While the rule permits a district court to "require[ ] otherwise"—that is, to require an expert to testify to the underlying facts and data before giving opinion testimony—it is within the court's discretion to so require. Moreover, this rule only relates to the manner of presenting testimony at trial and is irrelevant to the pre-trial admission concerns of a *Daubert* motion. Fed.R.Evid. 705 cmt. (1993), 4–705 Weinstein's Federal Evidence § 705.06. Therefore, Rule 705 cannot help defendants in their quest to exclude the expert testimony.

#### (6) Rule 403

Defendants further argue that Klein's testimony should be excluded as unduly prejudicial because it is unsupported by an adequate

**116**

factual foundation for all the reasons previously described and would therefore risk misleading the jury and confusing the issues. (Docket No. 117, p. 23). At the very least, defendants argue, they are entitled to a limiting instruction explaining to the jury that it may consider such evidence only as part of the basis of the expert's opinion and not for its truth. (Docket No. 168, p. 12). However, the Supreme Court and First Circuit have emphasized that, to the extent possible, expert testimony should be "tested by the adversarial process ... rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Ruiz–Troche*, 161 F.3d at 85 (citing *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786). I find that the concerns about Klein's testimony raised by defendants will be adequately grasped and evaluated by jurors. Defendants' arguments here go to the weight of the underlying data and the credibility of people involved with collecting and storing that data. These issues go to the heart of jury considerations of weight and credibility and are not unduly complicated by any stretch of the imagination. Thus, the challenges to Klein's testimony are best raised and evaluated by the jury and do not require the court to exclude them.

### (7) Hearing

The need for a hearing has been resolved as to Klein. The parties agreed that Klein did not need to testify, and the parties at the hearing did not offer the testimony of any other witness. (Docket No. 206).

### CONCLUSION

Based on the foregoing, defendants' motion to exclude the proposed expert testimony is **DENIED.**

**IT IS SO ORDERED.**